BROWNING *v.* THE STATE, 33 Miss. Rep., 47.

### HOMICIDE.

The refusal of the court to grant a continuance on the affidavit of the defendant, that material witnesses are absent, when the state admits as true the facts expected to be proved by such witnesses, is no ground of error.

A mistake in the copy of the special *venire,* by which the Christian name of a juror is slightly changed by mistake or inadvertence, is not error, especially when no objections are made before the trial.

The circuit court, into which a criminal case has been removed by change of venue, must try the defendant upon a certified copy of the indictment, and not upon the original. Browning v. State, 30 Miss., 656.

The court is not bound to instruct the jury in mere abstract propositions of law, which would mislead rather than enlighten the jury.

The declarations of a messenger sent by the prisoner to a third party, if made with reference to the object of his visit, are admissible in evidence against the prisoner, if it be shown that they were made by his authority. SMITH, C. J., *dissenting.*

The admission of improper evidence when the defendant sustains no injury thereby, is no ground of error, or for setting aside the verdict. SMITH, C. J., *dissenting.*

What circumstances will amount to proof, can never be a matter of general definition; the legal test of its sufficiency to authorize a conviction, is its power to satisfy the understanding and conscience of the jury. Absolute metaphysical demonstration is not essential to proof by circumstances. It is sufficient if they produce moral

certainty, to the exclusion of every reasonable doubt. Cicely v. State, 13 S. & M., 211; McCann v. State, ib., 440. As to the case at bar, SMITH, C. J., *dissented.*

To judge of the weight of circumstantial evidence, is peculiarly within the province of the jury, and, therefore, a verdict on such evidence, unless it is opposed by a preponderance of testimony, or palpably without evidence to support it, will always stand. As to the case at bar, SMITH, C. J., *dissented.*

Where the jury in a capital case, the trial of which lasted four days, lodged in a room at a public hotel, separate from the other guests, ate their meals at the table with the guests and boarders, but in a body at one end of the table, with an officer stationed between them and the other guests, were served at the table by the landlord and servants, were under the vigilant care of two sworn officers, could easily hear the conversation going on at the table, but none of the witnesses examined on the application for a new trial heard the case mentioned in the hearing of the jury, *Held,* that as the jury were always kept together, and under the supervision of a sworn officer, it is not to be presumed that any undue influence was exercised over them ; and that the manner in which they were fed, though an irregularity, was insufficient to vitiate the verdict. FISHER, J., *dissented.*

The refusal of the court to grant a new trial, asked for on the grounds of irregularity in the jury, and the want of evidence to sustain the verdict, was assigned as error; and on the hearing of the cause on writ of error, SMITH, C. J., and HANDY, J., were of opinion that the irregularity in the jury was insufficient to vitiate the verdict, from which decision, FISHER, J., dissented, while HANDY, J., and FISHER, J., (SMITH, C. J., dissenting,) decided that the evidence supported the verdict. On motion to set aside the judgment of affirmance in the case, it was held, That as the same majority of the court did not agree on both grounds for refusing the new trial, the judgment of affirmance should be set aside, and the judgment of the court below reversed and the cause remanded. HANDY, J., *dissented.*

Error to Holmes circuit court. HENRY, J.

The plaintiff in error was indicted with his son, Gaston E. Browning, for the murder of John W. Neal. The indictment was found in Sunflower county, but on application of the defendants the venue was changed to Holmes county, where there was a severance had, and at the November term, 1855, of the Holmes circuit court, the plaintiff in error was tried, convicted and sentenced to death.

Before the jury was empanelled, the defendant applied for a continuance, on account of the absence of several witnesses which he deemed material for his defense. In support of his application, he made an affidavit setting forth what he expected to prove by each of the witnesses who were absent. The district attorney admitted that the facts which the prisoner expected to prove by the absent witnesses were true, and should be so considered by the court and jury on the trial, and thereupon the court refused the application and forced the prisoner to go to trial, and the prisoner excepted.

On calling the special *venire*, the name of J. J. Cowsett ap-

peared on the list, and one John J. Cowsett appeared and answered to the name. In the copy of the *venire* furnished the prisoner, the juror's name was written Joseph J. Cowsett, and the juror stated upon his examination that his father's name was Joseph J. Cowsett, but that he (the juror) was summoned.

The defendant then objected to proceeding any farther, because he had not been furnished with a true copy of the *venire.* The state consented for the juror to stand aside; the court overruled the objection; whereupon the prisoner excepted.

After the jury had been empanelled and sworn, the district attorney offered to read to the court and jury a copy of the indictment against the prisoner and Gaston E. Browning, regularly certified in the record from the circuit court of Sunflower county, to which the prisoner objected, and demanded that the original should be produced and read. This objection was overruled and the district attorney read the copy of the indictment to the jury. The district attorney then produced in court a paper which he stated was the original indictment, and which, on comparison with the copy read to the jury, differed in this, that in that portion of the copy which describes the mode in which the deceased was murdered, the word "neck" is omitted. The prisoner then objected to the reading of said copy because it was not a true one. This objection the court overruled, and the prisoner excepted.

The substance of the evidence, as disclosed on the trial is as follows:

The deceased, John W. Neal, was engaged at the time of his death as overseer on the plantation of Hill and McNeill, in Sunflower. The last time he was seen by any of the witnesses was at said plantation, on the 23d day of July, 1854. On that day he ordered dinner earlier than usual, with the intention of going by prisoner's house and crossing at his ferry and to visit a Mr. Pool, and return home that night. Deceased left home between twelve and two o'clock that day; he took a gun with him, which he said he wanted to sell or have cut off. He rode a clay-bank-colored horse, and wore an overcoat. He was in good spirits, and talked a good deal about the prospects of a good crop on the plantation. He said just before he left, that it was possible that

he would not return home that night, and that if he did not he would go by Sidon (a small town on Yazoo river), and bring home with him, on Monday morning, some files which were needed on the plantation. One witness accompanied him on his road on Sunday evening about one mile, and returned immediately back to Mr. Cole's, about one mile from the house on the plantation, and two miles from where he left Neal, and when witness arrived at Cole's it was about three o'clock. This witness never saw deceased wear any bandages such as shown in court. A negro boy was sent after the files which Neal was to bring home with him; witness directed the negro to go by Browning's.

The distance from McNeill's plantation to Browning's house, on the Yazoo river, was about six miles, and about two miles from Browning's to Pool's.

On Monday morning the horse which Neal rode on the evening before was in the possession of Gaston Browning, on the road leading from McNeill and Hill's plantation to the house of the prisoner, and about one mile distant from the latter place. At this point Gaston Browning and some others were at work on the road. The horse was not carried to Browning's house until Monday evening, when Gaston returned from working on the road.

On Tuesday morning, the negro who had been sent after the files arrived at Browning's, and stopped there, and informed the prisoner and his family that Neal had left on the preceding evening, carrying his gun with him, and had not returned.

On Monday morning the skiff of the prisoner was found in Yazoo river, lodged, as it seemed, to a tree or limb, and about one mile below the prisoner's house, and near to that bank of the river on which he resided. Prisoner's family were informed of this, and a negro boy and James Browning were sent to bring it up.

On Tuesday morning, after the arrival of the negro sent for the files, the prisoner and Gaston Browning solicited G. J. Petty to assist in searching the Yazoo river for the body of Neal, stating that they supposed he was drowned, and giving as a reason for such belief that Neal's horse had been found on Mon-

day morning, about one-half mile back of Browning's house, in the swamp; that the negro had informed the family that Neal had left home on Sunday evening, and had not been heard of since; that the skiff had been found as before stated, and that Neal, when crazy, at Browning's house, the winter before, had threatened to drown himself in the deep hole in the river where the skiff had been found. Petty and the two Brownings went in Browning's skiff down to Pool's, who lives on the opposite side of the river, near where the skiff was found; and Gaston went after Pool and asked him to assist in searching for Neal, telling Pool that the prisoner had sent him for that purpose, and also to get him to take his ferry-flat and assist in the search. Pool took his flat and he, and the Brownings, and Petty searched the deep hole where the skiff had been found, and where the prisoner said he supposed Neal was drowned. No trace of the body being discovered, and Pool deeming it very improbable that Neal was drowned, the search in the ferry-boat was discontinued, and Petty and the Brownings, at the suggestion of the prisoner, went in a skiff down the river to a plantation called Shell Bluff, about three miles from J. D. Browning's. At this place the prisoner stated to N. S. Fields, who was overseer, and to J. C. Fields, who resided there, that he was searching for Neal's body; that he supposed he was drowned, giving the same reasons as he had given to Petty; and he further stated to them that Neal had made a will, giving $300 to Mrs. Browning, and the balance of his estate to the prisoner; that he had told Neal that he did not want his property, and if he did not want any of his relations to have it, he ought to give it to the public schools; and that Neal was deranged at the time, and said he was going to drown himself; this happened the winter before. Browning asked Fields to keep a negro looking for the body, and to let the neighbors who lived on the river below know about the matter. Browning also said that McNeill, one of Neal's employers, had requested him to attend to his business, in the event anything should happen in his absence, and that he was going out to the plantation that evening. The prisoner, Gaston Browning and Petty started back up the river about eleven o'clock. After dinner the prisoner sent his son

Gaston up the river to the house of the sheriff of Sunflower county, to carry an attachment, and from that place to McNeill and Hill's plantation to look after their business. About the same time Petty, who lived about a quarter of a mile from Browning, started to work on the road leading to McNeill and Hill's plantation. The prisoner also started with Petty, saying before he started, that he was going to the plantation to take charge of their business, as requested. Petty parted from the prisoner before they reached the fork in the road, where one road led to McNeill and Hill's, and the other to Shell Bluff. It was shown, however, by witnesses for the state, that Mercer had written a letter to B., on Tuesday morning, requesting him to come down the river, and swear in some appraisers, and that Pool, who was at Browning's on Tuesday morning before Browning left, in reply to a statement of Browning that he had received that letter, but would have to go to McNeill and Hill's plantation, advised Browning to send Gaston out to the plantation, and to go himself and swear in the appraisers, and that the road to the place where the appraisers were to be sworn in, led by Shell Bluff. Soon after he parted with Petty, the prisoner arrived at Shell Bluff, as he stated, on his way down the river to swear in the appraisers. About five minutes after he arrived at Shell Bluff, the negro stationed on the bank of the river to watch for the body of Neal, reported that he saw a body floating down the river. The prisoner and J. C. Fields were then in the house at Shell Bluff, and at so great a distance from the body that J. C. Fields could not distinguish it, but the prisoner stated, upon the negro making the report, " that it was the body of Neal; he could swear to it." The body was floating on the face and belly, and very deep. Browning and the negro boy got into a skiff and rowed into the river. Browning attached a fishing-line to the body, and had the boat rowed about one hundred yards below the landing. As soon as the skiff and the body were fastened to the bank, the prisoner commenced untying the ropes about Neal's body, but failing to untie them he came out on the shore, and asked N. S. Fields (who had arrived about the time the body was landed) for his knife, which Fields gave him. Browning then went to the end of the skiff

farthest from the bank, and commenced to cut the ropes around Neal's body. Fields protested against this, saying that the body ought not to be interfered with until a coroner's inquest should be held over it. Browning said he was a sworn officer, and had a right to cut the ropes, and that he wanted to get Neal's key. Browning then hitched the knife under the ropes, and in trying to cut them, raised the body so as to enable Fields to see that there was a bag of bricks attached to it. Fields remarked to Browning that he saw the bag of bricks, and Browning then cut the rope which attached it to the body, and it fell into the river where the water was about four feet deep. Browning then commenced unbuttoning Neal's coat, and said he wanted to get Neal's pistol. Upon being asked how he knew Neal had a pistol, he said that Neal owned one and always carried it. Prisoner then took a pistol from one side of Neal's breast. N. S. Fields then saw a knife on the other side of Neal's breast, and told Browning to take that up also. Browning replied that he did not think Neal had a knife. Fields said he saw one on his breast, and Browning then took it up. Browning also took from Neal's pocket his pocket-book, and then came out of the skiff, and asked N. S. Fields to have a coffin made, and that they should proceed to bury him, saying that the body would be so offensive by the time a jury could be collected, that the law would not require the men "to sit on it." The two Fields objected, and one of them started off to summon the neighbors, and the prisoner and the other Fields remained on the premises. Some of the neighbors arrived that evening, and during the night a physician was sent for, who also arrived during the night. Before daylight of the next morning, when only eleven men besides the physician had arrived, Browning insisted on holding the inquest then, taking the doctor for the twelfth juror, and giving as a reason that the body would become still more offensive. This proposition was declined by the company present. On Wednesday morning the inquest was held, Browning, who was a justice of the peace, acting as coroner.

The body, when discovered, had on the usual clothing, and also a heavy winter overcoat, which was buttoned up to the chin; gloves were on the hands, and drawn up over the cuffs of

the coat; strings of baling twine were around the gloves, over the wrists, and around the pantaloons, just above the ankles, but neither the feet nor the hands were tied together. The collar of the overcoat was turned up, and a twine string tied around it. There were two bandages, made of towels, about fourteen inches wide, around the body, under all the clothes; one of these extended from the hips up the body, its entire width; the other was over the breast, extending down and meeting the other. They were both buttoned in front, and also tied with twine strings. The holes through which the twine strings were tied, seemed to have been cut with a knife. The twine strings were each of them short, only passing through two holes in the bandages, one on each side of the buttons. The button-holes in one of the bandages were worked, as if intended for ordinary use. The lower bandage was fastened by straps of towels, running around the thighs, and tied in each groin in a very large knot. The upper bandage was fastened over the shoulders by similar straps, which were all tied into a large knot on the back of the body, at a place where it was thought by the witness that Neal could not have tied them. A twine string was also tied around the neck, and in the swollen condition that the body then was, it was very tight, and slightly imbedded in the flesh. The body was not taken out of the water until Wednesday morning. One of the witnesses who assisted in taking it out, stated that he then noticed that the neck was very limber, and hung to one side. The body was then much swollen, and decomposition had proceeded to a considerable extent. One of the eye-balls was protruded, and lay on the cheek; the other was also protruded. There were four bruises on the head, one on the temple, and three on the occipital portion of the head. The bruises were small and round, and about the size of a silver dollar. The skin was not broken at either of the bruises, nor at any other place on the body. The witness, Dr. Dodd, took off the scalp, and found coagulated blood under the skin, beneath the bruises; he also removed, with a saw, a part of the skull, and it was not fractured externally or internally. He did not think that the blows caused the death of Neal. While making the examination, witness noticed that the neck

was limber, and he then said he thought it was luxated. He saw coagulated blood about the chest, also on the calves of the legs and on the thighs—that is, "those parts appeared bruised." Witness thought at the time that Neal had been hung, and that the discoloration of the chest was produced by a determination of the blood to that part while hanging. Upon cross-examination, he stated that his opinion that Neal was hung was based on the fact that the neck was dislocated. The brain was in a softening condition, so that no correct examination could be made of it. In Neal's mouth was some tobacco, which had been chewed but very little, also some bread crumbs.

P. A. Davis, a witness for the state, was one who assisted in examining the body at the inquest. He turned the head round without moving the rest of the body, and remarked that his neck was broken. The prisoner was standing by; the witness looked up at him as he made this remark, and the prisoner turned pale and leaned over the bank of the river.

As the body was being taken out of the water some one remarked that he believed Browning was the murderer, or was connected with it, from his looks. Browning was pale and excited. Most of the jury looked pale. The body was very offensive. During the inquest, Browning remarked that he thought Neal had been murdered by negroes.

Browning remarked to N. S. Fields, on Wednesday, that he had had a settlement with Neal, and had paid him the balance found due, which was $42.62. After the inquest was over, Browning opened Neal's pocket-book; in it were a sovereign, half-eagle, and quarter-eagle, and some silver coin; there was also what was thought by one witness, the impression of a $20 gold piece. The pocket-book of Neal was produced in court, and a $20 gold piece and a new silver half-dollar were compared with the impression referred to; the former was found to be a little too large, and the latter very slightly too small to fill it.

Soon after the body was buried, Browning said to the company present that he would go out to McNeill and Hill's plantation to see about their business. Some of the jury proposed to go with him, but he objected, saying that he was afraid that in the present excitement their negroes might be interfered with, or that

they would be frightened and run off. Several of the jury, however, went with him. When they got there, Browning, in the presence of the others, endeavored to unlock Neal's trunk but could not do it; thereupon Mercer took the key and opened it without difficulty. In the trunk were found some valuable papers and Neal's will, all of which were, by the persons present, delivered to Browning and his receipt taken for the same.

The prisoner and Gaston E. Browning were arrested for the murder of Neal on Friday, July 28th, 1854. On that evening or the next day—it does not appear which—the prisoner's house was searched, together with his whole premises. When it was proposed to search his premises, he did not object, but wrote to his wife to permit a full and thorough search. His house was situated on the west side of Yazoo river, which, at that place, runs from a direction a little east of north to a point of the compass a little west of south. A public road ran between his yard-fence and the river, leading up the river bank to the residence of H. H. Southworth. This road unites at right angles with another road at the south-east corner of Browning's yard; this latter road leads directly from the river, and is called the Sunflower road. From Browning's house to the road leading up the river, the distance is about twenty-five feet; from the Sunflower road to an old house used as a saddle house, the distance is sixteen feet. The saddle house is an open entry between two rooms; there is a gate opening into the Sunflower road, nearly opposite the entry. Browning at that time kept a public house for the entertainment of travelers; he also kept a public ferry across the Yazoo river, where the Sunflower road touched the bank. Southworth's residence is about three hundred and fifty yards north-east of Browning's house, and on the road leading up the river. Southworth's negro-quarters were about the same distance below Browning's house and also on the river. Browning's brick-kiln was about forty yards from his house up the river, and in the direction of Southworth's and between the road and the river.

Upon the search, there was found in the saddle house, a hemp rope about twelve feet long; this had a noose at one end of it, which hung out from the rope at right angles. On the rope near

the noose were found several hairs, corresponding exactly in color and length with Neal's hair; there were also several spots of what seemed to be blood on the rope, and that portion of it upon which the spots were, seemed to have been washed or dragged through the water. A small piece of towel was also found which corresponded in appearance with the bandages around Neal's body. A bunch of twine was also found, much tangled and cut, so as to have a great many ends to the pieces of twine. A very minute search was made, but nothing else was found, except Neal's saddle and bridle, which were on his horse when in the possession of Gaston Browning on Monday. The saddle and bridle were in the saddle house, and the rope referred to was not all concealed, but lying on the floor of the saddle house. On Saturday, some of the witnesses examined Browning's skiff, and in it they found some spots of blood, which seemed to have been washed or rubbed.

On Wednesday, the prisoner and several of the neighbors examined his brick-kiln. It was found, by comparing them, that the bricks in the sack exactly fitted places in the kiln from which bricks had recently been taken. N. S. Fields stated that there were some human foot-prints about the kiln, but he could not discover more than one which was perfect and entire. It was made by a coarse shoe or boot, of medium size, say No. 8 or 9; that Neal had on when found, thick boots of medium size, say No. 9 or 10. Neal's boots were too large for witness, and the track at the brick-kiln was also larger than witness's.

During Browning's trial before the committing court, one witness visited a maple tree situated about four hundred yards west of Browning's, and about fifty yards north of the Sunflower road. The tree was in a thicket, and about twelve feet from an old trail leading from the Sunflower road. This witness saw tracks in this trail, but saw none immediately around the tree, where leaves were on the ground. He also saw "a mark on the tree."

J. C. Reeves, a witness for the state, visited this tree the day after the trial of the prisoner before the committing court. There was a fork in the tree about thirteen or fourteen feet from the ground. He climbed the tree, and, in the fork, saw a slight

indentation as if made by something drawn through. On visiting the tree a second time in company with J. Y. McNeill, about two weeks afterwards, they found some hairs of light color corresponding with Neal's; they also, at that time, saw a rotten chunk near a small bush, broken, and both ends turned up, and, in the place where the chunk was broken, was an indentation which fitted one end of a large gum stick lying near by. This gum stick was about five feet long, two inches in diameter at one end, and three inches at the other end. There were some marks on the tree about seven feet high, as if made by a knife; witness could not tell whether it was fresh or not; and that he did not find any hairs at all on his first visit. McNeill proved, in addition to the evidence of Reeves, that there seemed to have been a good deal of trampling about the tree.

Another witness, who visited the tree about the 8th of August, noticed "that in the fork was an impression about the size of a walking-stick, a slight indentation of the bark, and, on each side of the fork, it was a little frazzled."

J. Y. McNeill, for the state, testified that Neal had a rifle-gun; it was rather long, half-stocked, of medium size bore, and steel-mounted; the spring keeping the tallow box closed was defective, so that in hunting or other use the lid would sometimes open; the stock of the gun was dark.

E. B. Redus, for the state, testified that he was at Browning's about a week before he started to the trial in November, 1854. He had his washing done there at that time. He and William Browning went up stairs—William a little ahead of him. As they got to the top of the stairs, William Browning stepped forward quickly, and picked up a rifle-gun, and carried it to a corner of the room, and set it up by a clothes press. As he stepped forward and took hold of the gun, he remarked, "I wonder what in the h—ll this gun is doing here!" It was leaning up against a bed. The gun was a rather long one, and was half stocked; it had a percussion lock, and was steel-mounted; the tallow box was open; the stock was dark. Witness saw the breech of the gun, and about a foot in length of the barrel above the lock; he saw a small portion of the upper end of the barrel of the gun over William Browning's shoulder. He afterwards went back,

and did not find the gun where William put it, or anywhere else. Willliam Browning in carrying the gun had it in such a position as to have the triggers on the under side.    Witness did not see the lock; it was on the left-hand side of the gun.    The tallow box was on the right-hand side; it was round, and its lid was about the size of a half-dollar.    Witness could not tell whether the rifle had a single or double trigger.    Witness did not think he had said on Gaston's trial that he could not tell whether it was whole or half-stocked, nor did he say on that trial that he only saw the upper end of the ramrod of the gun over Browning's shoulder.    He did not remember whether the ramrod projected beyond the muzzle or not.    Witness was not sure that the lock was on the left-hand side of the gun; he did not see it or notice it.    He remembered seeing the cock; it was a percussion gun.

Thomas Botters, for the defense, testified that he acted as counsel on the trial of Gaston Browning.    He cross-examined E. B. Redus, touching the description of the gun he saw, and he distinctly remembered that Redus then said he only saw the upper end of the ramrod over William Browning's shoulder, and did not see any of the muzzle of the gun, and that he further stated, that he could not tell whether it was a whole or half stocked gun.    The remarkable fact that Redus only happened to see the end of the ramrod impressed itself on witness' mind as improbable.

W. B. Helm and Wm. Carthian, who were also counsel for Gaston Browning, corroborated the statement of Thomas Botters. So also did J. M. West, a witness for the state, but understood Redus to say that he saw the muzzle down to the first thimble over Wm. Browning's shoulder.    Upon cross-examination he stated, "that he was not sure he said down to the first thimble ; something was said about a thimble;" witness could not say positively whether he said he saw from the muzzle to the first thimble, or from the lock to the first thimble from it.

M. F. Nesbitt, the prosecutor, for the state, testified that he heard Redus give in testimony on the trial of Gaston Browning. Redus stated, that he saw about a foot of the lower part of the barrel; he understood Redus to say the gun was half stocked.

William Browning, a son of the prisoner, testified on his behalf, that the gun referred to by Redus was brass mounted, and belonged to the prisoner.

J. Y. McNeill, for the prisoner, stated that the lid of the tallow-box on Neal's rifle was two and a half or three inches long, and that it was not so wide as long; it was made in the usual proportions. He thought it opened at the end of the stock by placing the finger nail under the lid and raising it. The lock of the rifle was on the right side, the tallow box was on the left side. Witness was not sure as to the shape of the tallow-box.

There was only one plantation or residence on the road from McNeill and Hill's to Browning's, and it was proved that the only white person on that place was absent in the swamp, surveying, from ten o'clock A. M. to four o'clock P. M., on Sunday the 23d of July, 1854. It was shown that Neal left home between twelve and two o'clock of that day. Pool and Dunaway arrived at Browning's on that evening about two o'clock, and remained there about one hour and a half. Metz crossed the river at Browning's ferry on the same evening at three o'clock, and saw Pool and Dunaway at Browning's. Petty and Davis passed Browning's about one half hour by sun, going from Southworth's dwelling to his quarters. None of these parties saw anything of Neal or his horse. Pool and Dunaway saw all the family at home, and saw nothing unusual or suspicious in the conduct of any of them. Petty, when he passed with Davis, saw Gaston Browning. Dunaway crossed over the river in Browning's skiff on Monday morning; the skiff had water in it and looked like it had been washed.

After the prisoner had been arrested, and on the morning after the search had been made, the prisoner, who was then on his trial before the committing court, called John W. Boyd to him, when the following conversation occurred, as related by Boyd: "The prisoner asked me if we had discovered anything about his premises. I told him not much, and yet it might be a good deal. He then asked me if his children and negroes were scared. I told him they were not. He asked me if we found out anything from Ed, his negro boy, about a twenty dollar gold piece; I told him we had not; he then said Ed had

found on Monday morning, a twenty dollar gold piece, in the ferry flat; that Ed brought it to him, and he gave it to his wife, and told her to put it away till the excitement was over, and if any one called for it, he could then have it.

After the prisoner was arrested, Neal's body was disinterred; and Dr. Fisher, who was present at the examination then made, testified that Dr. Loyd cut into the neck, and put his fingers into the incision, and moved the parts about; the neck was then luxated. Witness thought that Neal's death was caused by luxation of the neck. Witness also examined the sack attached to Neal's body and containing the bricks before referred to. He made out the letters E. Sm · ‾h; he took the dot for the dotting of an *i*, and the dash for the crossing of a *t*. E. Smith once lived in Sunflower county, and had recently died, and the place for landing his freight was Browning's.

The prisoner proved by his sons, William and James Browning, that he and Gaston Browning were at home on Sunday evening and during the night; that Neal never left there on that evening or night; and that they had not seen him since about two weeks before his death. Upon the rope found in the saddle house being shown them, they denied having any knowledge of it; but it was shown by two witnesses, that they had acknowledged, when the prisoner was on trial before the committing court, that the rope was the prisoner's ox-rope.

John Garrell, for the prisoner, testified that he was at the plantation of McNeill and Hill, in the latter part of January, 1854; that Neal was then strangely affected; was drinking more than usual; that soon after twelve o'clock, Neal got into a skiff on a large lake, in front of the house, and remained there till midnight. He threatened to drown himself, and proposed to witness to will him all his property, after paying his debts; that witness frequently persuaded Neal to get out of the skiff, and come to the house, but he refused. It rained hard, and Neal stayed out in the skiff during all the time it was raining, and when he came into the house he was very wet, and he asked witness if he could come in; he asked if there was any other person in the room, and, upon being told that there was not, he came. While he was in the skiff, Dr. Curtis and Mr. Cole came

to the house, and witness sent word to Neal that Dr. Curtis wanted to see him. Neal sent word back for Dr. Curtis to communicate to witness what he had to say to him. He seemed to be afraid of some person. He referred to a difficulty he had previously had at Sidon, and said he had no friends. Witness endeavored to persuade him that he had as many friends as his antagonist in that matter. The next day, the witness and Neal went to Browning's and both stayed all night there; two strangers stayed there the same night. When supper was announced, witness went out to get a drink of water; Neal followed him, and witness asked where he was going; he said he was going after water. The company then went into supper, except Neal; after supper was over, the prisoner and witness went out to hunt for Neal; they found him in the ferry-boat, in the end farthest from the shore. Witness and prisoner endeavored to induce Neal to come out, but he would not come. The prisoner and witness then went to the house, and Mrs. Browning went down to the boat to try and get him out. Neal seemed to be afraid of the strangers; and the witness and Browning endeavored to persuade him that the strangers would not hurt him, but could not succeed. As soon as Neal discovered Mrs. Browning coming, he turned loose the ferry boat, and floated down the river; the prisoner and witness followed, and overtook Neal about two hundred yards below the house; they then persuaded Neal to go back, but he would not go. They landed the ferry boat, and Neal then spoke of drowning himself; witness told him to "pitch in," he would see it well done. Witness did not think Neal intended to drown himself. Neal got out of the ferry boat, and remained all night on the bank of the river; it was a very cold night, and some of Browning's family sent Neal some fire, and he camped out. Neal could not be persuaded to leave his camp until about ten o'clock the next morning. He conducted himself very well the balance of the day; he drank a good deal during that day. Witness was unable to account for his strange conduct. Witness left Browning's that evening and never saw Neal afterwards. Witness informed Browning of Neal's conduct at the plantation the day previous to their arrival at Browning's house.

J. Y. McNeill, on the subject of Neal's derangement, testified as follows: "I was Neal's employer in 1854. In February, on my way from my residence in Claiborne county to the plantation in Sunflower county, I found Neal at Browning's in a deranged state. When he first came to where I was, and began to converse, he seemed sane, but he soon showed symptoms of derangement, especially when I spoke of his going home. He seemed to think there was some person out there waiting to arrest him. On ascertaining the condition of his mind, I advised Browning to keep him at his house for a few days; that I thought he would get better, and that he ought not to permit any one to converse with Neal on the subject of his derangement. Browning told me that Neal had been there about a week. A few days after my arrival, I went to Browning's after Neal, and he came home with me. During the summer, Neal did not appear to be deranged, but he had lost his wonted energy, and seemed suspicious of every one who came to the place."

McNeill further testified that on Thursday before Neal died, he left his plantation in Sunflower county to visit Claiborne county; that he came to Browning's to take a steamboat; whilst there the prisoner asked him how Neal was getting along; witness replied, "Not very well, and if he did not do better he should discharge him when he came back." The prisoner then remarked that he did not think Neal could get employment in the neighborhood; witness replied, he did not think Neal wished to do so, but that he thought he would go to North Carolina where his relations were. Browning spoke of his son Gaston, and indirectly, as witness thought, as an overseer; he also mentioned in the conversation something about Neal's will; witness understood him to say that Neal had made a will, giving Mrs. Browning $300, and himself the balance, after paying his debts.

This witness stated that at the time of Neal's death, a lawsuit was pending between witness and one Stoneburner, in which Neal was the only witness for McNiell; that after Neal's death the suit was decided against witness for the want of Neal's testimony; that in June before Neal's death, Neal told witness that Stoneburner had said to him, "Damn you, you will be killed;

I won't do it, but some one else will." Stoneburner, at the time of Neal's death, was living at Mr. Marye's, about four miles from witness' plantation, and about twelve miles from Browning's; that Stoneburner had some negro carpenters; that some three or four weeks before his death, Neal showed witness a memorandum showing that Browning owed him $240.

H. S. Cole testified that Stoneburner was at his house all day Sunday, the 23d of July, 1854, and left there about sundown; and Boyd, who was overseer for Mayre, stated that Stoneburner got home about sunset, and stayed there all night.

Wm. Duberry, for the prisoner, testified, that on the Tuesday evening on which Neal's body was discovered, he crossed the river at Browning's, and after he crossed over, he saw Browning's little boy bring a turtle up the river in the skiff and land it, and that it was then bleeding at the mouth. James Browning, on this point, stated the same as Duberry.

The statement in the prisoner's affidavit for a continuance, as to what he expected to prove by Dr. Richards, and which was admitted by the state to be true, is as follows : " That he, Richards, was present at the second inquest held over the body of Neal; that he is a physician by profession, and will state that, owing to the inartificial manner in which the examination of the body was made by the physician in attendance, it is extremely doubtful whether the dislocation of said Neal's neck was not produced by the persons who made the first examination of said body."

It was proven by F. C. Mercer, that Neal had some $300 in money, a few weeks before his death, which he said he was going to send to M. F. Nesbitt, to loan out for him, and that among his money were some $20 gold pieces.

Jacob Metz crossed Browning's ferry about twelve o'clock on the Sunday night before referred to; he called for the ferry-man to let him over, and recognized the voice of the prisoner calling his boy Ed, and commanding him to set Metz over; witness also observed that Browning's skiff was not at the landing, where it was when he crossed in the evening.

The prisoner proved, by several witnesses, a good character

for truth and honesty, and for peace, from the year 1836, up to the time that he was charged with the murder of Neal.

The same instructions were given and refused in this case as in the case of Gaston Browning.[1]

The jury having returned a verdict of guilty, the prisoner moved for a new trial on the following grounds :

1st. Because the court erred in forcing the prisoner into trial, after he had made his affidavit for a continuance, because the state admitted the truth of the affidavit.

2d. Because the court erred in forcing him to trial, when he had not been furnished with a true copy of the special *venire*.

3d. Because the court erred in permitting the district attorney to read to the jury what purported to be a copy of the indictment.

4th. Because the court erred in refusing the 14th instruction asked for by the prisoner (being the same as the ninth, in Gaston's case).

5th. Because the court erred in permitting illegal testimony to go to the jury.

6th. Because the jury found contrary to the law and the evidence.

7th. Because, while they had the case under consideration, they were permitted, and did board and eat, from day to day, at the public hotel, with all the guests and boarders, separated only by an officer sitting between them ; and said jury were exposed to, and might hear the conversation of said guests and boarders, and were waited on and served at said public table by the landlord and servants at said hotel; and there were ample means and opportunities for communication with said jury by means of and through said landlord and servants.

Upon the trial of this motion, Daniel W. Beall, for the prisoner, testified as follows : "I am one of the proprietors of the hotel kept at this place (Lexington). The jury that tried John D. Browning during the present term, were lodged and fed at said hotel during the trial, which lasted four days ; when at the hotel, before and after meals, and at night, they were kept in a room separate from the rest of the boarders and guests. They

[1] See 30 Miss. R., 651, 658.

got their meals at the public table, and usually at the same time with the other guests; they always occupied the west end of the table, six on each side; between them and the other guests I, always had provided a chair and plate on each side, to be occupied by an officer, or left vacant. The jury were usually conducted to the table by two or three officers, one officer preceding them; they were conducted from the table in the same manner. I noticed that the officers took unusual precaution to prevent any one from speaking to, or having any communication with the jury. I did not see the jury in the dining-room at any time, when there was not an officer sitting or standing by them. The jury could hear the conversation of the guests sitting nearest to them, when carried on in an ordinary tone of voice. On several occasions the jury got their meals after the other guests had eaten. My servants and myself served the jury at the table. I did not speak to any of the jurors, nor did any of the servants, as far as I know; I charged my servants not to speak to the jury, and so did the sheriff. I don't think the case elicited more interest than such cases usually do."

Cross-examined: "I did not speak nor hear any one else speak of the case in the hearing of the jury; during most of the time they were eating, I was at a carving table in a remote part of the room from the jury. I thought once of noticing for conversation about the case, and did notice for awhile, but did not hear any thing said about it. I feel certain it was not mentioned at the table in my hearing. About twenty witnesses in the case were boarding at the hotel, and got their meals at the same table with the jury."

P. C. Richardson, for the prisoner, stated that he, on one occasion, inadvertently took one of the seats intended to be left between the jury and the guests; and that soon afterwards the jury came in, and one of them took the seat next to him, and thus situated they ate that meal; an officer stood behind them all the time. The guests and boarders were usually talking during meals; the jury could hear those who were nearest to them. Witness did not hear the case spoken of at the table.

J. M. West, the sheriff, for the state, testified, that he assisted in taking charge of the jury, in the case of John D. Browning.

There was no conversation about the case in his hearing at the table where the jury ate. "I was particular to listen and notice for it. I usually, while at meals, remained by the juror next to the other guests, and on the north side of the table. I sometimes walked to the west end of the table to assist in waiting on the jury; there were usually two or three officers in charge of the jury in the dining-room; never less than two. The servants and Beall, with myself and bailiff, waited on the jury; the servants were ordered, and Beall instructed, not to speak to the jury. There was usually conversation going on among the guests, but not about the case; it would have attracted my attention. When I was at the extreme western end of the table, a word or so about the case might possibly have been uttered by guests nearest the jury, without my hearing it; but nothing like a regular conversation could have occurred. When I was at the western end of the table, there was always another officer about the jurors next to the guests."

Being cross-examined, he stated: "It was possible that a servant, in waiting on the jury, could have handed to a juror, a written communication, without my seeing it; and it is also possible that a servant might have whispered a word or so in the same way, though I think it very improbable, as I was on the lookout; of course I could not look at all twelve of the jury at once. I was at every meal with the jury, except once at breakfast."

Samuel C. Johnson, for the state, stated that he acted as bailiff to the jury in the Browning case, and was with them at every meal they ate, except one. He usually stood or sat between the jury and the guests, on the south side of the table. He heard no conversation about the case in the hearing of the jury, and saw no communication between any one and the jury, directly or indirectly. He thought he saw Richardson, at one meal, occupy a seat next to the jury, or the one next to it.

James M. Haynes, for the state, testified that he was a regular deputy sheriff, and after conveying the prisoner to the jailer, upon the adjournment of court, he usually went to the hotel, where he arrived, sometimes before the jury finished their meals, and sometimes afterwards. He heard no conversation about the case in their hearing.

This was all the testimony on the motion. The court overruled it, and the prisoner excepted, and sued out this writ of error.

*Thomas Botters* and *J. Z. George*, for plaintiff in error.

*D. C. Glenn*, attorney-general.

HANDY, J.:

The plaintiff in error was indicted, together with his son, Gaston E. Browning, in the circuit court of Sunflower county, for the murder of John W. Neal. The venue was changed to Holmes circuit court, where the parties were tried separately, and were both found guilty of murder. The case of Gaston E. Browning has recently been decided here, and the judgment reversed, upon grounds which are stated in the opinion of the court.[1]

After the verdict, in the case now under consideration, the prisoner moved to set it aside and for a new trial, upon sundry grounds, which motion, being overruled, a bill of exceptions was taken, embodying all the evidence adduced on the trial, and the rulings of the court in the cause; and, upon these arise the questions, which are here to be considered.

We will proceed to examine the several grounds, upon which it is insisted that the verdict should be set aside, the judgment reversed, and a new trial granted.

1. It is said, that it was error not to grant the continuance moved for by the prisoner on his affidavit setting forth material facts, which he could establish by certain witnesses, who were absent, and that it was not sufficient, that the prosecution admitted the facts, as stated, to be true. This is no ground of error. Domingues v. State, 7 S. & M., 475. Under the admission, the prisoner was entitled to treat the facts stated in his affidavit as absolutely true, according to their force and effect, as stated; and supposing, that he stated the facts not more nor less strongly than the truth, it is not to be presumed that he was prejudiced by their admission.

2. The next ground of error is, that the prisoner was not furnished with a true copy of the special *venire* summoned to try

[1] Supra, p. 860.

him, the copy furnished him containing the name of Joseph J. Cowsett, when in the original *venire* it was J. J. Cowsett, and the juror summoned and called was John J. Cowsett.

This objection comes within the rule laid down in McCarty v. The State, 26 Miss., 301. The mistake in the copy must have been through inadvertence, and one which might quite easily occur under the circumstances, without an improper design, and no injury is shown to the prisoner in consequence of it. In addition to this no objection was made to proceeding with the trial at the time, and it was too late to raise such an objection after the verdict.

3. The third and fourth grounds of the motion have been considered in the case of Gaston E. Browning, and held to be insufficient.

5. The fifth objection is founded on the admission of the declarations of Gaston E. Browning, made after the death of Neal, to which the prisoner objected on the trial. The only declarations of this character, which appear to have been objected to, are those mentioned by the witness Pool, and are in substance, that on Tuesday morning, after Neal's death, Gaston came to the witness's house, and told him, his father, the prisoner, had sent him to get witness to take his ferry-boat down the river, and help them to look for the body of Neal. This was objected to, but the testimony was admitted, and we do not consider it error under the circumstances. The declarations objected to, were clearly immaterial, because it was not denied, that the prisoner was searching in the river for Neal's body, which he insisted was there by drowning. And when the witness went to where the prisoner was, he found him searching for the body, in accordance with the message he had sent to the witness. If, therefore, these declarations of Gaston were material, the circumstances tended strongly to show, that they were made by the authority of the prisoner, and should be taken against him. But, they are immaterial, and are mentioned by the witness as the commencement of his knowledge of the transaction, it being impossible that the fact stated could have any effect upon the case.

The next objection to the verdict is, that it is contrary to the

evidence. This point has been urged with great earnestness and ability by the counsel for the plaintiff in error, and has received that anxious deliberation, which its importance, as well as the strange and mysterious character of the case, in most of its details, demanded.

The principal facts of the case appear to be briefly as follows:

The deceased was the overseer on a plantation in Sunflower county, lying about seven or eight miles from the prisoner's residence in the same county, which is near the Yazoo river. On Sunday, the 23d of July, 1854, the deceased left the place where he resided, declaring his intention to go by the prisoner's house to Mr. Pool's, who lived on the opposite side of the river, and to return either that evening or on the next morning. He left on horseback, clad in ordinary summer clothes, taking his blanket coat, on which he rode, and a rifle gun, which was very long, and which he said he took to get it cut off. He left between twelve and two o'clock, in the daytime, and it is not shown, that he was seen afterwards alive. He was temperate at the time, and did not appear to be laboring under any mental affliction. He did not return as he promised. On Monday afternoon, his horse was found in the possession of Gaston, who said he had found him in the woods near the prisoner's house. A negro was sent on Tuesday, from the plantation, where the deceased had resided, and, in passing by Browning's, told him that Neal had not returned home. The prisoner said that he had drowned himself, and summoned persons to search the river for the body. He said he knew that he had drowned himself, because he had said he would drown himself; and his horse, saddle and bridle, had been found the preceding day in the woods back of his place. On Tuesday morning, the prisoner, with Gaston and one of the state's witnesses, whom he had requested to go upon the search, went to search the river for the body. A skiff belonging to prisoner was found in the river on Monday morning, loose, and the prisoner said he supposed Neal had drowned himself there. They searched that place, but did not find the body, and went below to a place called Shell Bluff, where he requested one of the witnesses to station a negro to watch for the body,

and to warn the people below to watch for it, and returned up the river to prisoner's house. He said, while at Shell Bluff, that he was going that evening to take charge of the McNeill place, where Neal had been, as he had promised McNeill to do so in case it became necessary. After remaining at prisoner's house, until about three o'clock P.M., he and the witnesses, who had searched the river with him, started thence and rode together three or four hundred yards on the Sunflower road, which leads to McNeill's, the witness understanding that he was going to McNeill's, and the witness left him and turned off to attend to negroes under his charge, and the prisoner rode on. Shortly after this, he was at Shell Bluff, and he had been there but a few minutes, when the negro, stationed to watch for the body, came to prisoner and another witness, and reported that the body was floating down the river. Prisoner and the witness went to the landing, and saw the body at a long distance in the river, prisoner asserting positively, that it was Neal's body. Prisoner and the negro went after the body in a skiff, and brought it to the bank. It was lying with the face and belly down, and sunk quite deep, and had on a blanket coat over the other clothes, and there were ropes tied around the body outside the clothing. Prisoner went to the end of the skiff, and commenced untying and cutting the ropes around the body. Two witnesses protested against his interfering with it, but he claimed the right to do so, as a justice of the peace. In cutting the ropes, he raised the body so as to enable the witness to see a sack of bricks, which was tied to the body, which he cut off, and it sank to the bottom. He then proceeded to unbutton the coat (the witness still objecting, and he claiming the power to do so as before), and took the key, pocket-book, pistol and knife of the deceased from the body, and desired witness, who lived at the place, to have a coffin made and proceed to bury it, because he said it would be so offensive before a jury could be assembled, that the law would not require an inquest upon it. The witnesses objected, and one of them proceeded to give notice to the neighbors, and the body remained in the water until the inquest was held.

The prisoner insisted that the inquest should be held by eleven men, taking the physician for the twelfth, urging, as a

reason, that it would be so offensive by the morning as to render the inquest impracticable. The others objected.

The body, when examined, was found to have twine strings tied around the wrists and around the ankles outside of the clothes, and under the clothes were two wide towel bandages, tied and buttoned around the body. There were found three or four bruises on the occipital part of the head, which must have been made by a round or blunt instrument, as the skin was not broken, though the blood was coagulated; but they were not sufficient to produce death. There were also bruises on the breast and on the calves of the legs. The physician who examined the body at the first inquest, states that the neck was luxated, and that that was the cause of the death. Another physician, who examined it on the second inquest, is of the same opinion; while a third physician, who was present at the latter inquest (it was conceded by the admission of the facts stated in the prisoner's affidavit), would prove that, owing to the inartificial manner in which the examination of the body had been made by the physician, it was extremely doubtful whether the dislocation of the neck was not produced by the persons who made the first examination. One of the jurors of the first inquest states, that whilst the jury were examining the body, he turned the head around without moving the body, and remarked that the neck was broken. Prisoner was standing near, and witness looked at him as he made the remark, and the prisoner turned pale and leaned over the bank of the river.

During the inquest, the prisoner seemed to be aware that he was suspected; and when the last juror arrived, which was not until late on Thursday night, he proposed again that the inquest should proceed, for the reason previously stated by him; but the others objected, and it was not held until daylight. In the meantime, he told this juror that he supposed the deceased was murdered by negroes.

After suspicion had arisen against the prisoner, search was made about his premises, and a rope was found in a house in his yard with appearances of blood upon it, with a knot and noose, around which were hairs corresponding in color and appearance with the hair of deceased. Appearances of blood

were discovered on the skiff, which seemed to have been rubbed or washed. On Monday morning, the skiff appeared to have been washed out.

The deceased is shown to have had a twenty-dollar gold piece and other money a few days before his death. When the prisoner took the pocket-book from the body, it had some money in it, and had an impression in it which looked like one made by a twenty dollar gold piece; but on producing the pocket-book at the trial and applying a twenty dollar gold piece to the place, it was found that the coin was a little too large for the impression, and a new silver half dollar was found a little too small to fit it.

It was in evidence that after the search of the prisoner's house, he asked one of the witnesses if they had discovered anything about the premises; to which it was replied, "Not much, and yet it might be a great deal." He asked if the children and negroes were searched, to which the witness said "No." He asked if they found out anything from Ed (his negro) about a twenty-dollar gold piece. Witness said they had not. He then said Ed had found on Monday morning a twenty-dollar gold piece in the ferry flat, and brought it to him, and he gave it to his wife, and told her to put it away until the excitement was over, and if any one called for it he could then get it.

It was in evidence that one of the witnesses, who was at the prisoner's house shortly after Neal's death, had occasion to go up-stairs, and that he saw a gun, which, from the partial view he got of it, corresponded with the description of Neal's gun, which he had with him when he left his place of abode. The testimony is somewhat conflicting as to the description of the gun as given by the witness corresponding with that of Neal. But it is in evidence that the prisoner's son, who was with the witness when he saw the gun, stepped forward quickly and took the gun, which was leaning against a bed up-stairs, and put it away, expressing anger and surprise that the gun was there. The witness afterwards went back, but did not find the gun where the prisoner's son had put it, or anywhere else. The prisoner's son proves that the gun alluded to was his father's,

and of quite a different description from that given by the other witness. It does not appear that Neal's gun was ever found or accounted for, nor was the gun, as described by the prisoner's son, produced and identified.

In connection with the statements of prisoner in relation to Neal having drowned himself, he also said that Neal had told him that he intended to leave Mrs. Browning about $300, and the balance to the prisoner, after paying his debts, but that he told Neal that he did not want his property, and that he had better leave it to a public school. It was proved that Neal was intimate with the prisoner, and had great confidence in him; that he had been laboring under partial mental derangement from the use of ardent spirits in the winter of 1854, but had recovered, and was in his right mind in the summer, and was temperate in his habits. McNeill, his employer, states that he was not deranged, but had lost his wonted energy, and seemed to be suspicious of every one who came to his plantation. This witness states that he was at the prisoner's house on Thursday before the death, and prisoner asked him how Neal was getting along, and he replied not very well, and that if he did not get along better, he would discharge him. Prisoner said he did not think he could get employment in the neighborhood, and spoke of his son Gaston indirectly, as he thought, as an overseer. He also mentioned Neal's will; and witness understood him to say that Neal had made a will giving Mrs. Browning $300 and the balance of his property to him after paying his debts. And it appears, by other testimony, that, after the inquest, he objected to other persons going to McNeill's, on the ground that he was afraid the negroes might be frightened and run off. It also appears that Gaston went to McNeill's place on Tuesday evening, and said that he had come to take charge of McNeill's business; that Neal was drowned.

Several of the witnesses for the prosecution state that they saw no blood on the skiff. A witness for the prisoner proves that he crossed the river between eleven and twelve o'clock on Sunday night, and that the prisoner was then at home. He crossed the ferry in the ferry-boat. When he crossed the previous afternoon, about three o'clock, the skiff was at the ferry;

but it was not there when he returned and crossed at night. He saw nothing strange about the ferry.

The prisoner's son testified that the prisoner was at home all day Sunday; that Gaston got home shortly after dinner; that they ate supper about dark, and prisoner went to bed soon thereafter, and Gaston and witness soon after their father; that Neal did not come there that day or that night, so far as he knew. Testimony was offered for the purpose of discrediting this witness. Another son of the prisoner also stated that Neal was not at the prisoner's house on Sunday or Sunday night. Testimony is also adduced to discredit this witness. This witness and another account for the blood on the skiff by stating that it was caused by cutting a hook out of a turtle's mouth in the skiff.

Several witnesses testified to the good character of the prisoner before this charge was made against him.

These being the material facts which appear to have any important bearing on the case, it is insisted, in behalf of the plaintiff in error, that they are not sufficient to support the verdict in either of two points of view: 1st, That they are insufficient to show, with necessary legal certainty, that Neal came to his death by the violence of another, and that he was not drowned by his own act; 2d, That they are not sufficient to warrant the conclusion that the prisoner participated in the murder.

Before proceeding to consider these points, it is proper to recur to the rules of law by which the sufficiency of the evidence is to be tested. The evidence in the cause was entirely circumstantial, and the rule in such cases is thus stated in Cicely v. The State, 13 S. & M., 211: "That the legal test of the sufficiency of evidence to authorize a conviction is its sufficiency to satisfy the understanding and conscience of the jury; that a juror ought not to convict unless the evidence excludes from his mind all reasonable doubt of the guilt of the accused." And in the case of McCann v. The State, ib. 490, the following rule is laid down, cited, as the one just quoted was from Starkie, as the only one which can be regarded as of practical application:

What circumstances will amount to proof can never be matter of general definition; the legal test is the sufficiency of the

evidence to satisfy the understanding and conscience of the jury." On the other hand, absolute " metaphysical and demonstrative certainty is not essential to proof by circumstances. It is sufficient if they produce moral certainty, to the exclusion of every reasonable doubt." In Cicely's case, such evidence is held to be peculiarly within the province of the jury, from its character, because it is always solemnly to be weighed and acted upon by their understandings and consciences, and is, from its very nature, the subject of inferences and conclusions in their minds. And the rule is there stated to be " that a verdict will always be permitted to stand unless it is opposed by a decided preponderance of the evidence, or is based on no evidence whatever."

Applying these rules to the verdict and the evidence with respect to the first point, we cannot say that the verdict was unwarranted by the evidence.

There is scarcely a circumstance shown in the case that renders the hypothesis that the deceased drowned himself at all probable. The only fact tending to establish such a result is his declaration made during the previous winter, and whilst he was laboring under partial derangement of mind, that he intended to drown himself. And the testimony tended to show that he had recovered from that attack, and had been temperate, and was sane on the day of his death, and had evinced nothing of mental derangement for a considerable length of time. The presumption of law is, that he was sane, and there is nothing to destroy that presumption as applicable to his condition when last seen.

It is not contended that there is any evidence that he was drowned by others, nor is it insisted upon, with any confidence, that the evidence shows that he committed suicide otherwise than by drowning.

The circumstances against the hypothesis that he drowned himself, and in favor of that, that he came to his death by violence inflicted by others, are clear and strong. The bruises on the occipital part of the head, which could not have been inflicted by himself; the bruises on his breast and calves of his legs; the luxation of the neck, which was discovered by one

of the jurors when the body was examined; the coagulated blood about the neck, which increased from the surface of the skin to the vertebrae, and which showed that the death was produced by luxation of the neck; the opinion of two physicians who examined the body (one at the first inquest and the other at the second), that the death was caused by hanging or strangling and luxation of the neck; the improbability that Neal should get bricks from the prisoner's brick-kiln, which was near his house, and make all the preparations which he must have made in order to drown himself in the condition in which his body was found, and go by the prisoner's house to the ferry or the river and not be discovered by some one of the prisoner's family, who all profess not to have seen him; the strangeness of his tying twine strings around his neck and both of his wrists and ankles, which no man about to drown himself would be likely to do, or could easily do, but which might readily and naturally be done by another who wished to sink a dead body about to be thrown into a river; and lastly, the declaration of the prisoner, after it was manifest, from an examination of the body, that the deceased had been murdered, that he had been murdered by negroes.

Against these circumstances, the only evidence that has any force is the affidavit of the prisoner, stating what he could prove by Dr. Richards; which was admitted as evidence by the state. Giving to that testimony all its force as absolutely true, it would only show that it was, in his opinion, extremely doubtful whether the dislocation of the neck was not produced by the inartificial manner in which the examination at the first inquest was made. Two other physicians, one who made the first examination, and another who attended at the second inquest when Dr. Richards was present, are of opinion that the luxation of the neck was caused by hanging, and state satisfactory reasons for their opinion. And one of the jurors remarked about the dislocation of the neck, whilst the jury were examining the body. From these and all other circumstances above referred to, we think that the jury were well warranted in coming to the conclusion, that the neck was broken, and that the death was produced in that manner.

But if it were conceded with reference to the point under

consideration, that the luxation of the neck was produced by the inartificial examination of the body, it would not follow that the deceased did not come to his death by strangulation or hanging, which, according to standard medical authorities, might produce death without causing luxation of the neck.

Let us next consider the circumstances in evidence, tending to show that the prisoner was implicated in the crime.

1. The evidence presented to the jury a motive to commit the act, which it was their province to graduate. That was, the expectation of succeeding to Neal's property, and the hope of securing the place filled by him on McNeill's plantation for his son Gaston. The testimony of McNeill shows, that these things were upon his mind but a few days before Neal's death.

2. The prisoner was the first to declare and insist that Neal had drowned himself, and to make the search for the body. His conduct about the search and inquest was deeply suspicious; his positiveness that Neal was drowned, his alacrity in searching the river for the body without a particular inquiry at Neal's residence about him; his having a negro placed below on the river to watch for it; he going above; his arrival at the place where the negro was watching immediately before the body came floating down; his positiveness that the body was Neal's, when it was at too great a distance to be identified, and nearly under the water, lying on the belly, with a blanket coat on, in the month of July; his persisting in cutting the ropes around the body, against the remonstrances of the others present, which might very rationally have proceeded from the motive of cutting the sack of bricks tied to the body, and bricks, that may have been tied to the wrists, ankles and neck of the body, by the strings there found, as a means of preventing detection; his anxiety to bury the body speedily and without inquest; and his further insisting on an inquest without a full jury; and at night; his paleness and alarm, when it was mentioned, in making the inquest, that Neal's neck was broken; his declaration to Burns (after being apprehensive that Neal was believed to have been murdered, and that he was suspected), that Neal had been murdered by negroes; his declarations to Fields, before he left Shell Bluff on Tuesday morning, and to Petty after he had returned

home and dined, that he was going to McNeill's place that evening, and his starting apparently with that purpose, but instead of going there, got to Shell Bluff shortly before the body was discovered floating down, having turned off from his road to McNeill's, after Petty left him; his objecting to the jury of inquest going to McNeill's; his proceeding to take charge of McNeill's place, and Gaston going there for that purpose on Tuesday, before he knew that Neal's body was found; and his statements in relation to the twenty-dollar gold piece, that his negro Ed found it in the ferry-boat on Monday morning, and brought it to him, and he gave it to his wife, telling her to put it away until the excitement was over, and then that the owner could have it.  It would appear that this last incident all took place on Monday morning, and before there was any excitement about Neal's death.  At all events, his statements evince a restless anxiety to account for the gold piece, when the testimony shows that Neal had recently had such a coin in his possession, and when he knew, that the pocket-book had been opened by him in the presence of suspecting witnesses, who had seen it and might have discovered the impression of the coin in it.

3. The rope was found on the prisoner's premises, in an outhouse close by his dwelling-house, having on it the appearance of blood, and hairs corresponding in color and appearance with Neal's, also a noose and knot at one end, where the hairs were found.

4. The skiff was at the ferry landing of prisoner on Sunday afternoon, about three o'clock, but was not there, when the witness Metz recrossed, about eleven or twelve o'clock that night. It was found next morning down the river, and appeared to have been washed out.  Several of the witnesses saw marks of blood upon it, which had been rubbed or attempted to be washed out.

5. It appears that Neal's gun was never found; and there was evidence tending to show, that it was seen by one of the witnesses in an upper room of the prisoner's house.  On the contrary, the prisoner's son proved, that the gun seen by the witness was of quite a different description from that of deceased, and

that the gun seen belonged to the prisoner.  The witness for the state testified, that he had afterwards looked for the gun where he saw it, but could not find it there or elsewhere.  The gun alleged to be the prisoner's was not produced on the trial, nor its absence accounted for.

In the most of the above particulars, the evidence was without material conflict as it is stated; but, upon some of them, there was testimony in behalf of the prisoner, either tending to contradict or to explain that in behalf of the state.  This was the case with regard to the identity of the gun and the impression in the pocket-book.  The first point involved a question of credibility of the witnesses, and it was not material to give force to the prisoner's declarations about the gold piece, that its impression should appear in the pocket-book, for the deceased might have had the coin in his pocket-book and without leaving any impression, or the impression made might have been diminished in size by the shrinking of the pocket-book, after it had been soaked for many hours in the water and then dried.  But the force of the circumstances connected with this coin arises from the prisoner's declaration about the excitement, made with reference to the coin, before any suspicion of Neal's death had been excited.

These numerous facts and circumstances all indicate that the prisoner was implicated in the death of Neal.  If the jury gave entire credence to the testimony of the witnesses, who deposed to them, which was their especial privilege, it is impossible for the mind to come to the conclusion, that the verdict was without testimony to support it, or that it is clearly against the preponderance of the evidence; and that is the question which we are called upon to decide.  The evidence is sufficient to show a motive in the prisoner to commit the deed, a course of conduct inconsistent with his innocence in nearly all his actions after its discovery, with evidence of guilt traced to his premises; and, after the full and fair instructions given by the court in his behalf, we cannot say that the evidence was not sufficient to satisfy the understanding and conscience of the jury, to the exclusion of every reasonable doubt.  For the question with us is not, whether the verdict is clearly right, but is it manifestly wrong.

The only remaining objection to the verdict is founded upon the fact, that the jury, during the time when they were deliberating upon the case, took their meals at the public table at a hotel, where they were exposed to influence from the conversation of persons generally, at the table, and where improper communications might have been made to them.

The testimony to support this objection is, first, that of Beall, one of the proprietors of the hotel, who states that the jurors always occupied the west end of the table, six on each side, with a place on each side to be occupied by an officer in charge of them or left vacant; that they were usually conducted to and from the table by two or three officers, who used unusual precautions to keep any one from having communication with or speaking to the jurors. Witness did not see the jury at any time in the dining-room, when there was not an officer sitting or standing by them. They could have heard the conversation of guests at the table. Witness and his servants waited on them at the table; witness did not speak to them, nor did the servants, to his knowledge; witness and the sheriff had both charged them not to do so; did not hear any one else speak of the case in their hearing; witness was the greater part of the time at a carving-table, in a part of the room remote from the jury. There was an officer always in the dining-room where the jury were. The case was never mentioned at the table in his hearing. There were about twenty witnesses in the case who took their meals at the same table with the jury.

The sheriff testified that there were never less than two officers in charge of the jury in the dining-room of the hotel. He was with the jury at every meal except one, and there was no conversation with them in his hearing; that he was attentive in noticing the jury, and was generally with the juror next to the guests, though he sometimes went to the other end of the table where they were sitting, to wait on them. The witness and Beall and the servants waited on the jury. When he was at one end of the table, attending to the jury there, it is possible a word or two might have been uttered to those at the other end by the guests near them; and when he was at one end an officer was at the other. A servant might have said a word or handed

a note without witness seeing it; but he thinks that very improbable, as he was on the watch.

Johnson was a bailiff having the jury in charge, and was with them every meal except one, and usually stood or sat between them and the guests; heard no conversation about the case, and saw no communication between any one and the jury, directly or indirectly.

From this testimony it appears that the jury were all kept together, without any separation, and though they took their meals at a public table, at a hotel, where other guests were seated, they were always under the charge of a sworn officer, and generally, if not always, under strict vigilance. The case is, therefore, different from any one in which it has been held by this court, that the verdict was vitiated by improper conduct, as by persons being admitted to them in the absence of a sworn officer, or when one or more of the jurors separated from his associates, and was out of the sight or supervision of the officer. It is not to be presumed, that when the jury were always kept together, and under the direct supervision of a sworn officer, that any undue influence was exercised upon them, because, considering the probability of detection, and the severe consequences to be visited upon them, it is not to be supposed that others would attempt or that the jurors would admit any improper influence to be addressed to them.

The present case, therefore, comes within that class of irregularities, which are contrary to the proper forms of proceeding, but not sufficient to vitiate the verdict. Hare v. The State, 4 How., 194.

It is much to be regretted that irregularities of this nature are of so frequent recurrence in the circuit courts, notwithstanding the rules, which have been repeatedly held by this court, and which, if followed and rigidly enforced against officers and jurors, by exemplary punishment, would prevent all such irregularities. And, it is much to be regretted, that the learned circuit judges appear to be so little disposed to prevent violations of such established and salutary forms as are necessary to the validity and purity of judicial proceedings, by the exercise of the ample powers with which they are clothed. This evil, which is so

often presented for our consideration, can be easily prevented by prescribing rules, by which juries will be kept from all possibility of communication with others, and by enforcing such rules inflexibly, by proper punishment of all violations of them. Such rules may cause personal inconvenience, but they are necessary to the proper administration of justice, and to the purity of judicial proceedings, for which every citizen is bound to yield his personal convenience when necessary.

Let the judgment be affirmed.

SMITH, C. J., concurred in the opinion of Mr. Justice Handy upon all the points discussed, except as to the sufficiency of the evidence to sustain the verdict. On this point the chief justice delivered an elaborate oral opinion, in which he reviewed all the evidence, and declared it to be his conclusion, that the evidence was insufficient to sustain the verdict.

FISHER, J., also concurred in the opinion of Mr. Justice Handy, except as to the last point discussed. He was of opinion that it was error to permit the jury to take their meals at the hotel, under the circumstances stated in the record.

Under the foregoing opinions, a judgment of affirmance was entered in this court. Afterwards, the counsel for the prisoner entered a motion to correct the judgment, so as to reverse the judgment below, upon the ground that two of the judges were of opinion that there was error in the record, and that a new trial should be granted.

This motion was argued by

*Thomas Botters* and *W. B. Helm* for the prisoner, and *D. C. Glenn*, for the state.

FISHER, J.:

This is a motion to correct the judgment entered in this case, by changing the judgment of affirmance into a judgment of reversal, so as to make it consistent with what is alleged to be opinions of a majority of the court.

To understand correctly the point presented for consideration, it will be necessary to refer briefly to the respective opinions of each member of the court. The most important points involved in the case, arose in the court below, on the motion for a new

trial.   It was first insisted, that the verdict finding the prisoner guilty, was not sustained by the evidence, and

Second, That the jury, during the four days of the trial, took their meals at the public table in the town of Lexington, and were, without stating specially the grounds, exposed on such occasions to improper influences.

Upon the first point, two members of the court were of opinion that the testimony was sufficient to uphold the verdict.   The chief justice dissented on this point.   Upon the other point, the chief justice and Judge Handy were of opinion that there was nothing shown in the conduct of the jury, while at the hotel, to authorize the court in disturbing the verdict.   This being the attitude of the court, a judgment of affirmance was entered, on the ground that the law presuming the judgment of the court below to be correct, it could only be reversed upon a majority of the court agreeing that there was error in the judgment, or proceedings connected therewith.   The question, in every case decided in this court, is error or no error in the judgment of the court below.   The party assigning error assumes the affirmative of the proposition; and hence, if a majority of the court do not agree as to such proposition, to wit: That there is error; the judgment must be affirmed, for the reason, that the presumption in favor of its correctness has not been rebutted.

But it must, at the same time, be borne in mind, that when it is said that the majority of the court must agree upon error, it is not necessary that the majority should agree upon the same point, unless such point could of itself constitute a distinct assignment of error; for it is not every point that may be argued by counsel, or be considered by the court, that could be assigned as error here.   Such points are considered, because they tend to support the assignment, supposing it to be formally made.   The question, therefore, is whether the two points already noticed, to wit: the insufficiency of the evidence to sustain the verdict, and the alleged improper conduct of the jury, could each constitute a separate assignment of error in this court.   If a verdict respond to the issue, whatever may be the want of evidence to sustain the jury in their finding, it must stand until set aside by the court, upon a motion for a new trial, or upon some other

legal proceeding. Such a thing as assigning as error, that a verdict was not sustained by the evidence, when no motion had been made in the court below, to set the verdict aside for this reason, was never known in this court, or even attempted by the most inexperienced practitioners. How, then, does this court apply the corrective in such case, to wit : in case of an erroneous verdict ? I mean erroneous, when compared with the evidence. I answer, in but the one way, by deciding that the court below erred in refusing to grant the new trial. Under what assignment of error, then, must the question of a wrong verdict be considered ? I answer, under the assignment that the court below erred in permitting such verdict to stand, and to constitute the basis of its judgment ; or, in other words, erred in refusing to sustain the motion for a new trial. Those matters, which could only be considered by the court below, on such motion, must enter into this assignment of error in this court. The court could only weigh the evidence upon the motion for a new trial, and in this way test the correctness of the verdict. The same may be said in regard to the misconduct of the jury. This question could only be considered upon the motion for a new trial, and it was but an additional reason urged upon the court for this purpose. Both points, the want of evidence and the misconduct of the jury, tended to establish the same proposition, to wit : a wrong verdict. The object was to show a wrong verdict. Two members of the court have agreed as to this point, that the verdict was wrong, and that the court below erred in permitting it to stand. Why, then, have not the majority agreed upon error in the judgment ? The chief justice says the verdict was clearly wrong, and that the court below erred in not setting it aside. I say the same thing—wrong verdict and error of the court in sustaining it, but base my opinion upon a different ground from that assigned by the chief justice. Do we not both agree, however, in the error assigned, or at least the only error which could, under any known rule, be assigned, that the court erred in pronouncing the judgment of death upon the prisoner, upon a verdict, which we both say was manifestly wrong ? It is not necessary that our process of reasoning should be the same, or that we should each attach the same importance to the same

points involved ; it is sufficient if we agree upon the error or substantial matter, to wit : Was the verdict manifestly wrong, was the act vicious, and has the court sustained such act ? The majority agree in this result—a wrong verdict and error in the court below in not setting it aside. Such being my view of the question, I am of opinion that the motion ought to be sustained, and that the correction accordingly be made.

In coming to this conclusion, that I may not be misunderstood, I again repeat that I hold that a majority of the court must, in every case brought into this court, agree upon error, before reversing the judgment of the court below. But when I make this declaration, I, at the same time say, that the error must be something which could, under proper rules of practice, be assigned as error.

The want of evidence to sustain a verdict, or improper conduct in the jury finding it, can neither be assigned as error in this court. They both, or either, may prove that the court below, whose duty it was to set the verdict aside, erred in refusing to do so. We only know the error in the verdict through the action of the court in sustaining it. We do not say in such case that the verdict is reversed, but that the judgment upholding the verdict is reversed, and a new trial shall be granted.

Handy, J., dissenting :

This case is now presented again, upon the motion of the plaintiff in error, to correct the judgment entered here, and to have a judgment of reversal entered.

The ground of this motion is, that in the opinions expressed in the decision of the case, a majority of the court considered that there was error in the record, one member of the court, (Judge Smith,) thinking that the evidence was not sufficient to sustain the verdict, and in which opinion he dissented from Judge Fisher and myself, and Judge Fisher being of opinion that the verdict should have been set aside and a new trial granted, by reason of the jury being permitted to take their meals with the guests at the public table of a hotel, and in which opinion he dissented from the two other members of the court.

It thus appears, that although two of the members of the court

are of opinion that the judgment should be reversed, yet they do not agree that there is any error in any specific decision or ruling of the court below; and when the various grounds of error assigned were considered by the court *seriatim*, a majority of the court were, and still are, of opinion that there is no error in any specific decision or ruling of the court.

It appears to me, therefore, clear, that the decision must be, that there is no error in the record for which the judgment should be reversed.

When a judgment is reversed in this court, it is the duty of the court to state in writing the reasons for the decision, in order that they may be a guide to the inferior court, to prevent the recurrence of the errors found to exist in the subsequent trial of the case, and in order to settle the rule of law involved in the case, for the benefit of all the citizens of the state, and in all similar cases in which it may arise, for the action of the citizen, or for the government of the courts. It requires a majority of the court to agree upon some specific rule or point of law which has been erroneously decided in the inferior court; and, although a majority of the court may not agree in the reasons which led each of their minds to the conclusion that any specific rule or point of law has been erroneously decided, yet it is necessary that a majority should concur in the opinion that there is error in one and the same rule or point of law, as held by the court below. Otherwise, if the case goes back for a new trial, and the same point arises, the decision of the court below would necessarily be the same as was previously made, because the judge would be bound to know that this court had held that there was no error in that particular decision; and the same rule of action would be observed by all other courts in the state whenever the same question might arise.

Otherwise, if upon a new trial of this case in the court below, the prisoner should be convicted upon the same evidence which appears in this record, and a motion for a new trial should be made upon the ground that the testimony was not sufficient to warrant the verdict, the court below would be bound to overrule it, because this court, which has the power to declare the law of the case, has, by a majority, decided that the verdict should not

be set aside upon that ground. And the same result would take place, if, upon another conviction, the conduct of the jury should be the same as appears in this record; for that is held by a majority of the court not to be error. If the case should be again brought to this court in the same condition in which it is now presented; what would be the decision? It appears to me impossible to avoid the conclusion, if the members of the court adhere to their present opinions, that the court below had committed no error upon either of these points, and, therefore, that the judgment should be affirmed, because it has been solemnly declared by this court that there is no error upon either of these points. And, if that judgment should then be reversed, it would be but the very case now before us, and in which it is held that, although a majority of the court determine that there is no error in either of these rulings, yet the judgment must be reversed; the result of which is that the judgment is reversed when there is no error. And such would be the strange and anomalous attitude of the case *ad infinitum*, as often as it should be tried below, and brought here under the same state of facts.

But it is said that the motion for a new trial, on account of the insufficiency of the evidence to support the verdict, and on account of the misconduct of the jury, presented but a single proposition which could be assigned for error here; that the error assigned was, that the court overruled the motion for a new trial; and, although the members of this court may differ as to the reasons why they think that the motion was erroneously overruled, yet if a majority think that it should have been sustained, one member upon one of the grounds stated in the motion, and the other upon the other ground, that the judgment must be reversed.

The error of this reasoning, I think, consists in this: the grounds upon which the motion for a new trial in the court below was made, are specified in the record. Each ground is separate and distinct from the others, involving points of law, and either of them, if decided in favor of the prisoner, would have entitled him to a new trial. Although the assignment of errors be general, that the court erred in overruling the motion for a new trial, yet when the case comes to be considered by this

court, each specification is the subject of separate and distinct deliberation, as each involves a separate and distinct point of law, properly arising in the case, and necessary to be settled upon its own merits.  Though the assignment or charge of error be general, it necessarily refers to the specifications of grounds contained in the motion in the court below ; and before the judgment can be reversed for error in overruling the motion, it must be determined by this court that the court below erred in its ruling upon some one specification.  The court might not agree in the reasons upon which the several members founded their opinion, but there would and must be an agreement of opinion upon the single point, that the particular specification was sustained, and that on that ground the new trial should have been granted. After deciding upon the first specification, the second is considered, and unless there be a majority of opinion, that the new trial should have been granted on that ground, there will be no error as to that.   And so each specification is taken up and considered and determined, *seriatim*, whether or not there be error in the ruling upon that point.   And though there be a minority of the court of opinion upon each specification that there is error, yet if no two of the members concur as to error upon some specific point ruled by the court below, the fact that two of them think that there is error, one upon one specification, and another upon another, will not cause a reversal, because a majority of the court consider that there is no error upon any specific point or rule of law presented as ground of error.

Under our present practice, no assignment of errors is made here in legal form ; but they are assigned in argument as they appear upon the record.  It is, however, said that the question under consideration must be treated as if there had been a general assignment of error, that the error overruled the motion for a new trial.  We are referred to the record to see what that motion is, and find it based on sundry grounds, any one of which, if sustained, would carry the motion.  The generality of the assignment does not amalgamate points and questions of law which are in their nature distinct, and which this court must pronounce upon as legal questions in deciding the case.  Suppose, on the trial, the court below had granted these instructions

at the instance of the state. The assignment of error here, on that ground, under the strict rule which formerly prevailed here upon the subject, would be a general one, that the court erred in granting the instructions for the state. And in considering that assignment, the first instruction comes up, and two members of the court think that there is no error in it, the third member considering it erroneous. It is then settled that there is no error as to that. The second instruction is then considered, and two members are of opinion that there is no error as to that, one of the majority upon the first instruction thinking that there is error in it. It is then settled that there is no error as to the second instruction. The third is then considered, and determined by a majority of the court to be proper, the member who agreed with the majority upon the two other instructions, dissenting upon this. It would be settled that there was no error in the third instruction. It would therefore clearly be the judgment of the court, that there was no error in any of the instructions. And how is it possible, that the general mode of assigning errors could make error in that which was not error in itself, or that several propositions which in themselves were distinct and separate, and ascertained to be correct and proper, could be rendered erroneous by being considered together?

I consider this motion as settled by the rule held by this court in the case of Bell v. Morrison, 27 Miss., 68, where the court was divided in opinion upon two points in the case, but there not being a majority holding that upon either of the points there was error. The first impression of the court in that case was, that the judgment should be reversed, there being a majority of that opinion, as in this case; but upon motion and after argument, the decision was that the judgment should be affirmed, which was accordingly done, because there was not a majority of the court holding that there was error in any of the points decided by the court below. The same rule is held in Alabama, in Cook v. Drew, 3 Stew. & Porter, 392.

When, therefore, it is the duty of the court to determine whether there is error in the points of law held by the court below, and this court is of opinion that there is no error in such

rulings, I cannot understand upon what principle it is that the judgment can be reversed.

I am, therefore, of opinion, that the judgment be entered, as in law I consider it to be, affirmed.

NOTE.—This case was decided at the April term, A. D. 1856.

This case and that of Gaston Browning had acquired so much notoriety in the county of Holmes, to which the venue had been changed in the first instance, that it was deemed advisable, both by the counsel for the prosecution and for the defense, to petition the legislature for an act changing the venue to Carroll county. This was accordingly done, and the case of John D. Browning was tried at November term, 1857, of the circuit court of Carroll county, when there was a mistrial. At the April term, A. D. 1858, he was again tried and acquitted. He was defended by W. Cothran, W. B. Helm, J. K. Clinton and J. Z. George, and prosecuted by E. C. Walthall, district attorney, and W. Brooke and Richard Nelson.

At the July special term, A. D. 1858, of the said court, Gaston E. Browning was tried and acquitted. He was defended by Messrs. Cothran, Helm and George, and prosecuted by E. C. Walthall and R. Nelson.