WILLIAM FOWLER v. STATE OF MISSISSIPPI.

[49 South. 625.]

CRIMINAL LAW AND PROCEDURE. *Evidence. Letter. Conspiracy to murder.*

A letter without probative force on the issues involved in a trial for murder, and of which the accused had no knowledge before the homicide, is not admissible in evidence to show his non-participation in a conspiracy to kill the writer, and the exclusion of the same is not reversible error.

FROM the circuit court of Tate county.

HON. WILLIAM A. ROANE, Judge.

Fowler, appellant, and his son Richard Fowler and son-in-law John Burnett, were jointly indicted in the circuit court of Panola county for the murder of Lawrence Turner. On motion the venue was changed to Tate county; appellant was separately tried and convicted of murder, sentenced to the penitentiary for life, and appealed to the supreme court.

The opinion of the court states the facts.

*P. H. Lowrey,* for appellant.

The evidence shows that the appellant was not present when the homicide was committed. There is no positive proof that appellant was in any way connected with the homicide, the circumstances shown in evidence tending, if at all, only to make him an accessory before the fact. *Newman v. State,* 72 Miss. 124.

The appellant not only did not participate in the homicide, but actually knew nothing about it until several days after the unfortunate tragedy. While it is true that the appellant had made threats to kill "stave hikers," referring to the young men who were working getting out staves, yet such threats were made on the date of a marriage of a daughter of his some time before the events connected with this killing.

The theory of the defense in the court below was that the deceased, Turner, was killed by Richard Fowler and John Burnett, a son and a son-in-law respectively of the appellant, because Turner was attempting to corrupt appellant's young daughter Bettie; and that the deceased was killed at a time when he was attempting to carry out an engagement made with her for improper purposes. The appellant had no knowledge that the deceased was attempting to debauch his daughter. The evidence shows that the appellant and his wife cannot read or write, but a letter from the deceased to appellant's daughter had been intercepted by the mother of Bettie Fowler, the daughter, and carried to the wife of John Burnett the son-in-law who helped to do the killing; and both the son and the son-in-law of appellant knew of the contents of the letter. Now, the son and son-in-law were the actual perpetrators of the homicide, according to the undisputed testimony of the son-in-law. The fact that the appellant suspected that the deceased was trying to elope with his daughter, and that appellant had permitted the deceased to continue his visits to the home, strongly negatives any question of knowledge on appellant's part that the deceased had unworthy purposes in mind with regard to his

daughter. If the prevention of the supposed debauchery of the daughter was the occasion of the crime, then the state has failed to prove that appellant had any suspicion of the deceased as to this. The court below excluded the larger part of the testimony offered by the appellant in support of his theory. and this naturally was to the great prejudice of the rights of appellant to have a fair and impartial trial.

It is distinctly shown by the testimony of Bettie Fowler and Miles Ramey that the deceased was not near appellant's home in order to effectuate his plans for an elopement with appellant's daughter but was there with a different purpose. Burnett, the son-in-law of appellant, testified that deceased was killed to prevent the consummation of this base purpose. Why the court below should have refused to admit the letter from the deceased to Bettie Fowler in evidence, when it was shown to the jury that the son and son-in-law of appellant knew its contents and acted as a result of having heard it read, is inexplicable. This letter, dated June 4, was full of endearing terms of affection, deplored the fact that the writer had been unable to see or hear from appellant's daughter for several days, and stated that the writer would have left the country long ago but for his great love for her. It further stated: "Darling you know where I saw you last, I cannot but think how good of you it was to be so kind to me, one that loves you more than anything in this life. Say, darling love, will you please tell me one thing for a certain fact, will you on the night before the Fourth of July see me where you did the last time I saw you and about the same time I think you will understand, when you answer this let me know," etc. It strongly suggests a prospective improper meeting and strongly tends to corroborate the testimony offered to show that there had been an improper meeting between the writer and the girl on the night of May 10.

It was offered to be shown by the testimony of John Burnett and others that appellant had nothing to do with the burial of the deceased, that he advised against the manner of burial and

in fact sought in a way to prevent it and urged the perpetrators to give notice publicly to the community of their acts as avengers of a great wrong done to the family. The court below however, excluded such testimony and this constituted error.

If, as contended by appellant, the killing was because of the debauching of the daughter, the state's theory must fall to the ground as invalid, and the evidence cannot be held to warrant the conviction of appellant. And if all of the evidence, including that which was by the court below excluded, leaves a reasonable doubt as to what motives prompted the killing, then the jury should have heard it all and the exclusion of any part of it was error. Questions of fact are for the jury, and such questions cannot be fairly decided unless every circumstance tending to establish the facts is admitted in evidence, and this is peculiarly the case when the evidence is circumstantial.

*George Butler,* assistant attorney-general, for appellee.

The record presents an unusual spectacle, a young lady testifying against her father and the father seeking to justify his acts by showing that his daughter had been debauched by her sweetheart.

It is complained in the brief and oral argument of counsel for appellant that the court below should have permitted the appellant to show that he advised against the burying of the body of the deceased. This was clearly a self-serving declaration made according to the appellant's own testimony some time after the crime had been committed; and, besides this, the record shows beyond a preadventure of a doubt that even though the appellant might have protested against the disposition of the body, yet he afterwards acquiesced in its burial, and that although he had a telephone in his house, he did not tell anyone of the crime until Tuesday, after its commission on Sunday, nor charge that his son-in-law and son were the perpetrators of it.

It is further contended by opposing counsel that the court

should have permitted a certain letter to be admitted in evidence, and opposing counsel seek to evade the holding of the court in *Reed v. State*, 62 Miss. 405, by saying that it was not the purpose of this proffered evidence to reduce the crime from murder to manslaughter but to show a motive on the part of young Fowler and Burnett to commit the deed for the alleged reason that it does not appear from the record that appellant had any knowledge of the existence of this letter. It is true that there is no direct and positive testimony that appellant knew of the existence of the letter, but there are many facts and circumstances showing his knowledge thereof. His wife knew it, his daughter knew it, his son knew it, and John Burnett knew it. From all the facts and circumstances in evidence it is inconceivable that appellant did not also know it. Now the court will bear in mind that certain clauses of the letter were read to Bettie Fowler on the trial without objection and she identified it as being in the hand-writing of the deceased. John Burnett testified that he participated in the killing to keep the deceased from debauching the girl. It seems too clear for argument that this assassination was planned and discussed by these three men, appellant, his son and Burnett, some time before its consummation. Of course, anything that would reduce Burnett's and Richard Fowler's crime from murder to manslaughter would likewise reduce appellant's crime. The letter furnished no greater motive to appellant's co-defendants than to appellant himself and it is evident that its only purpose in being shown in evidence could have been to show existence of *brevis furor*.

Under our law, as it now stands, it is practically for the jury to fix the punishment, and if the appellant had been found guilty as charged it might with some show of reason be contended for appellant that evidence of the kind offered was admissible but such a complaint had no place in this record because the jury fixed the punishment at imprisonment for life in the penitentiary.

Argued orally by *P. H. Lowry* and *L. L. Pearson,* for appellant, and by *George Butler,* assistant attorney-general, for appellee.

MAYES, J., delivered the majority opinion of the court.

On Sunday, July 5, 1908, Lawrence Turner was assassinated within thirty-five to fifty yards of the house of appellant and on appellant's premises. There were ten shots fired according to the testimony, and his slayers took his body and buried it in a sink hole. The crime was kept concealed for about two days, when appellant made known the fact of the killing by calling up one J. E. Hill, coroner and ranger of Panola county, telling him that he must come over to his home and take charge of the body of Turner, saying at the time that the killing was done by his boy. A searching party went over and found Turner's body buried as above stated. Subsequently Will Fowler, the appellant, his son, Richard Fowler, and his son-in-law, John Burnett, were arrested and charged with murder. Richard Fowler and John Burnett were tried separately from the appellant. The appellant was convicted, given a life sentence in the penitentiary, and from this conviction appeals.

Since one of the main assignments of error is predicated on the ground that the evidence is insufficient to sustain the conviction it is necessary to review the evidence tending to show complicity on the part of appellant. The facts are as follows: It seems that some time in the year, 1907, several young men, the deceased being one of them, were engaged in getting out staves in the neighborhood where lived appellant, and procured board with him. Appellant had several daughters, and, the young people being mutually attracted, it was but a short while until one of the young men eloped with one of them. The eloping daughter was quite young at the time, and the father was very angry about it. Subsequently another of his daughters married another of the young men; but this marriage was at home, and apparently consented to by the father. But appel-

lant seems to have been very indignant at these marriages, and seems to have harbored much ill will toward all these young men on account thereof. Lawrence Turner, the deceased, also fell in love with a third daughter, whose name was Bettie, and she seemed equally attracted toward him. After a while deceased quit boarding in the house of appellant and moved into another county, but continued his attentions to Miss Bettie, occasionally writing to her. About the 1st of July, 1908, intending to return to Panola county to visit his sweetheart, the deceased came back, and on Sunday night, the 5th of July, was shot down near her home and within thirty-five or fifty yards of her. The actual killing is shown to have been committed by Richard Fowler, her brother, and John Burnett, her brother-in-law, and, respectively, the son and son-in-law of the appellant. The killing took place about 10 o'clock at night, within thirty-five or fifty yards of where Will Fowler was seated, and the record shows that he never thought enough of it to make any inquiry as to what the shooting was about, though the killing was on his premises and ten shots were fired.

The theory of the state is that there was a conspiracy between all the defendants to murder Lawrence Turner; and, while the actual killing was done by Richard Fowler and John Burnett, it was in pursuance of the preconcerted plan of all these parties to assassinate this young man. The contention of the defense is that the appellant not only did not participate in the actual killing, but that he knew nothing about it whatever before it occurred. It is the state's theory that the killing was done in order to prevent the elopement of Bettie Fowler with Lawrence Turner, and that this was the only motive for the killing, and that the assassination was in pursuance of previous threats made by appellant, and that appellant not only knew that the killing was to occur, but procured his son and son-in-law to do the work.

The testimony of John Burnett, the son-in-law of appellant, was that appellant had nothing to do with the killing, was

utterly ignorant of it, and that they killed Lawrence Turner in order to keep him from debauching Bettie Fowler. It is shown in the testimony that appellant was violently opposed to his daughter marrying Turner, and stated to his daughter Bettie that if she married Lawrence Turner he would "put them both under the sod." It is shown that he had stated that, if any of these stave men undertook to marry any more of his daughters, he would kill them. When arrested, he told the justice of the peace making the arrest that he wanted him to be as light as possible, and further said that "what we done we done through ignorance." On the following morning he stated, "What we done, we had it to do; and you would have done the same thing we done."

A pair of trousers, which were described by the witnesses as belonging to appellant, were discovered shortly after the killing, with other garments, in a bloody condition, hidden in a treetop a few hundred yards from appellant's residence and on his premises. When all these ten shots were fired within thirty to fifty yards of him on the night of the killing, he made no remark and asked no questions, though the record shows conclusively that all there knew what happened. Early on the morning of the killing he was seen coming from the general direction where the hidden clothing was found. On the evening of the killing, it is testified by his daughter that he was talking to his son, and his son seemed to be very much bothered. He directed the searching party to the place where the body might be found, and seemed, so far as his testimony shows, as conversant with the details as any of the other parties charged with this crime. The son-in-law went over to appellant's house about 3 o'clock on the afternoon of the killing, and his gun had been carried over there on the Friday or Saturday before. On the day before the killing, and while deceased was in appellant's house visiting the daughter, he sent word by one Collier to the justice of the peace of that district warning the justice not to marry Turner and his daughter. Appellant then

stated that there had not been any trouble, but there might be trouble, and bad trouble.

John Burnett declared that Turner was killed "to keep him from ruining that girl," and because Turner had written for the girl to meet him, and yet the letter complained of was written on the 4th day of June; the killing taking place on the 5th day of July. They had known of the letter for three weeks, had permitted young Turner to come to the house to see Bettie Fowler on the 4th of July, Richard Fowler had invited Turner to stay all night at the house on the night of the 4th, not another thing had occurred to arouse suspicion of wrongdoing on the part of Turner and Bettie Fowler, and while Turner is in the house the appellant is sending word to the justice not to marry them, and threatening bad trouble if he did. At the very time that all this was going on the gun of John Burnett was around the premises for the purpose of killing Turner, and taken there by Richard Fowler, the one who had offered the hospitality of his home for the night of the 4th.

There is no evidence in the case showing that any improper relations ever had existed between Bettie Fowler and deceased. The jury believed that the killing was done for the sole purpose of preventing deceased and Bettie Fowler from eloping, and the facts fully warranted this belief. It is a fair and logical deduction from the evidence that the killing was planned beforehand between all of the parties charged with the crime. On the trial of the case the defense offered in evidence the letter written by deceased to Bettie Fowler on June 4, 1908. It was claimed in the testimony that appellant did not know of the letter, and it was stated by the defense that the object of introducing this letter was to show that there had been improper relations existing between deceased and Bettie Fowler, influencing Richard Fowler and John Burnett to kill him, but that the existence of this letter was unknown to appellant. It is contended that a knowledge of this letter fur-

nished a motive on the part of the son and son-in-law to do the killing unknown to appellant, and it is contended that this corroborates the theory that there was no conspiracy to do the killing in so far as appellant is concerned. This letter was excluded by the court, and this is urged as a reason for reversing this judgment.

Looking at the complete record, we do not think this judgment should be reversed, even if it be conceded that the letter was admissible, which in this case we do not concede, since it utterly fails to prove that which it was offered to prove. There is no proof of debauchery to be found in this letter. Taking the whole case through, the deed was a diabolical one, and the jury were fully warranted in taking their view of the facts that all were equally guilty of the crime and that the killing was done to prevent the elopement.

We do not deem it necessary to pursue each single assignment of error in this case. It would unnecessarily protract this opinion and serve no purpose. An examination of the instructions shows that the case was fairly presented on the law.

*Affirmed.*

WHITFIELD, C. J., delivered the following dissenting opinion.

The theory of the state, in this case against the father, was that the father participated in this killing to prevent his daughter eloping with the deceased. The theory of the defense was that the father had nothing to do with this killing, but that the deceased was killed by Richard Fowler and John Burnett, the son and son-in-law of the defendant, because the deceased had already had illicit relations with the daughter of defendant, and was seeking to continue them that night, and that he was not, therefore, killed to prevent their marriage; and yet the court below excluded the larger part of the testimony offered by the defendant in support of his theory, and in my judgment its action in this behalf was manifestly fatal error. There is

no positive and direct proof in the case connecting the defendant with this killing. His conviction rests solely upon circumstantial evidence, and within the rules stating the certainty required in that sort of case, as laid down in *Newman v. State,* 72 Miss. 124, 16 South. 232, and the *Browning case,* 33 Miss. 47, it is perfectly clear to my mind that this conviction was wholly unwarranted.

The testimony of Bettie Fowler, defendant's daughter, explains thoroughly many of the incriminating circumstances, as, for example, a pair of pants said to belong to the defendant, found hidden in a treetop a few hundred yards from defendant's residence, was sworn by Bettie Fowler to be the pants of her brother, Richard Fowler. It was shown that on Tuesday, after the killing on Sunday night, the defendant notified the coroner that a man had been killed and buried on his place; but he said that he had been killed by his boy. And it further appears clearly that it was necessary to get Richard Fowler to point out the exact spot where the body was buried, tending to show that the defendant did not know where the body was buried. It was shown that he had made a threat to kill "stave hikers;" but it is also shown that this threat was made before the marriage of another daughter, and that the threat, though with reference, clearly, to that marriage, never had been carried out; but, on the contrary, that this "stave hiker" was permitted to marry her at defendant's own home, showing his threat to have been mere general bluster. It is perfectly manifest that all that is said about the bloody clothing, the pants, etc., is worthless against the defendant, since it is plainly shown that he was not present at the time of the killing, but was staying in his house. There is no testimony that at the time of the killing the deceased was seeking to elope with the defendant's daughter. She herself positively testifies that she had no engagement with him that night; that she was not looking for him; that she did not know he was coming; and that he (the deceased) was in the neighborhood without any preparation for

an elopement; and there is an entire absence of any testimony in the record that the presence of the deceased at the house of the defendant at that time was in any way expected by the defendant. How, in reason, the state's theory of an elopement can be maintained on this testimony, and this defendant convicted on that theory on this sort of testimony, purely circumstantial, passes my comprehension. I think the testimony of Bettie Fowler and Miles Ramey shows conclusively that this deceased was not near this defendant's house, in the woods near ten o'clock at night, with any purpose of elopement whatever, but with a different and sinister purpose; and I think the whole testimony in the case shows that he was killed by the son and son-in-law of the defendant, because he had debauched the daughter, and was seeking to continue their illicit relations, of which illicit relations there is not a particle of evidence to show that this defendant had any knowledge whatever. It is entirely reasonable, under the testimony in this case, that the mother, and brother, and brother-in-law knew the daughter had been debauched, knew the contents of the letter of June 4th from the deceased to Bettie Fowler and that the father had no such knowledge. Neither the father nor the mother could read or write. The mother, however, had intercepted a letter to the daughter from the deceased, and carried it to her married daughter, the wife of John Burnett, the son-in-law who helped do the killing, and it is shown that both John Burnett and the son, Richard Fowler, knew of its contents; and it is also shown clearly that neither the father, nor Alice, the other single sister, knew anything of this letter. The very fact that the father suspected that they were about to elope for the purpose of marriage, and that he had permitted the deceased to visit his daughter at his house, is the strongest sort of evidence against any knowledge on his part, or suspicion on his part, that the daughter had been debauched.

It is shown that the deceased, after boarding at the home of this defendant, whilst making staves, had removed to Banner,

in Calhoun county, in January, but had returned to this neighborhood for a visit in March, and again in May. He was at the residence of the defendant in the afternoon of May 10, and was with his daughter Bettie. The defense offered to show that on that night Bettie absented herself from the house some time, so as to raise her mother's suspicions. This is shown by the testimony of Alice Fowler. Yet the court excluded this evidence. It should have been admitted. Soon after this visit, Bettie Fowler received from the deceased a letter, as is shown by the testimony of Alice Fowler, which letter she declined to read to her mother, stating as her reason that it would disgrace her. The letter was destroyed, and the court declined to admit any proof in connection with it. This was manifest error on the part of the court below. This letter was followed by another early in June, which also was intercepted by her mother, and was offered in evidence, but excluded by the court, as shown in the testimony of John Burnett, and the testimony of Alice Fowler. This letter was identified by the state's witness Bettie Fowler, and defendant's counsel sought to examine her with reference to that letter and its contents, which the court declined to permit. The action of the court in both these instances was manifest error, upon the theory of the defense. This last letter of June 4th unmistakenably points to the deceased and Better Fowler having had illicit relations at a meeting referred to in that letter, and tends to corroborate, however, remotely, the suggestion that there may have been an improper relation on the night of May 10, when her absence aroused the suspicions of her mother. The letter of June 4th requested Bettie Fowler to meet the deceased at night on July 3, at the same time and place he last saw her, and its contents point to nothing less than illicit relations on that former occasion.

Bettie Fowler's testimony that she had never seen the deceased at night, and that she last saw him before this letter was written, in the daytime, in her father's house, and in her mother's presence, tends strongly to show the consciousness of

guilt on her part as to what had occurred on the occasion of that first meeting, referred to in the letter of June 4. It must be remembered that Bettie did not get this last letter; it having been intercepted; and, keeping this in mind, it must also be remembered that the deceased came back into this neighborhood on the afternoon of July 3, on the night of which day he had requested her to meet him, and stopped with his friend Ramey; that he did go to the house of the defendant that night; that he returned there on the morning of July 4, he evidently not having accomplished his purpose, on account of his letter having been intercepted; that he left defendant's house, saying he would leave the community that day; that on the following evening, Sunday evening, he had a telephone conversation with Bettie late in the evening, referring to some engagement which had been defeated, and saying: "I will see you to-day, and will send you a message like the one I sent you before, only it will be a little different." And on that very night he left Ramey's house at 9 o'clock, wearing an old ragged coat and saying he was going in the other direction, to the home of Mr. Mars; but he did not go to the home of Mr. Mars, but turned up near the residence of the defendant at ten o'clock at night, making mysterious signals. These signals were heard by the brother and brother-in-law, who, having been put on guard by this same letter before referred to, had prepared to kill him, and did kill him; the defendant not being present and in no way participating in the actual killing. These circumstances are, to my mind, utterly inconsistent with the theory of the state that he was killed at the instigation of the father, to prevent the marriage.

It was offered to be shown by the testimony of John Burnett, Alice Fowler, and Bettie Fowler that this defendant had nothing to do with the burial, but advised against it, and tried to prevent it, and advised the persons who had done the killing to immediately give notice to the community of what they had done and let "the body be put away right." The court excluded

---

---

this testimony on the theory that it would be allowing him to make testimony for himself. But this testimony was not offered with that in view at all, but to show the fact that at the very time the crime took place the defendant had tried to prevent the secret burial of the deceased. This error is greatly emphasized by the fact that this secret burial was urged by counsel for the state as showing the guilt of defendant, when the defendant had offered to show that he had nothing to do with the secret burial, and protested against it, which testimony had been excluded by the court. I think it was error to exclude this testimony. It was part of the chain of circumstances supporting the theory of the defense, and defendant certainly had the right to have the jury pass on that theory.

The defendant also attempted to show, by witness Walter Webb with whom the deceased lived in Calhoun county, after leaving the neighborhood where defendant lived, that the deceased tried to arrange to bring one of the daughters of the defendant to Walter Webb's house, and Webb declined to permit it, unless he would get the consent of the parents or marry the girl. There was some doubt as to which girl this was— Alice or Bettie; the deceased merely having said that it was the oldest of the girls. The defendant offered to show that it was Bettie, and not Alice, that he proposed to bring there, and that he was purposely deceiving Mr. Webb about it; and as a means of showing this the defendant offered to show that Bettie wrote a letter to the deceased, which fell into the hands of Mr. Webb, and, further, that Alice never wrote the deceased any letter at all, together with certain other matters, especially the statement of the deceased to Webb that he did not intend to marry Bettie Fowler. This, too, it seems to me, formed a link in the chain of circumstances maintaining the theory of the defense that deceased was really killed because he had debauched, and was seeking to still further debauch, this daughter Bettie. All this testimony was excluded by the court below, erroneously, in my judgment.

I will protract this opinion no further than to note one other point. The court permitted Bettie Fowler to testify that her mother, about the time that the shooting occurred, told her it would not be good for her to say anything about it. Now, since the gist of this whole controversy is whether the father knew of and was accessory to this shooting, such a remark by him would have been competent and of potent circumstance; but it is just as clear that this remark by his wife in his absence—which was the fact—was as clearly inadmissible as any testimony could have been, and it is certainly evident that it was highly prejudicial to him. It was gross error in the court to permit this statement to go to the jury.

There are other errors, but surely, with this case resting on purely circumstantial evidence, and in view of the clearing up of the state's testimony by the testimony of Bettie Fowler and Ramey as to certain incriminating circumstances, and in view of the two entirely opposed theories of the state and the defense, these errors are fatal to this conviction, and this defendant is entitled to a new trial. This case should be looked at as a whole, with all the facts grouped, and particularly with the two theories of the state and defense placed in clear antagonism. When this is done it is perfectly manifest that the errors pointed out constitute fatal error, and that this defendant should have what he has not yet had, a fair trial according to the law of the land.