## Nelson James v. The State of Mississippi.

1. Criminal cases — evidence necessary to convict. — In criminal cases the evidence, as a whole, must be such as to produce a moral certainty of guilt, and to exclude any other reasonable hypothesis.

2. Same — same — what is full proof. — Evidence which satisfies the minds of the jury to this extent constitutes full proof of the fact in question.

3. Same — circumstantial evidence. — While circumstantial evidence, to warrant conviction, should tend to exclude every other supposition inconsistent with the defendant's guilt, it need not necessarily show it to be impossible that any other person could have committed the crime.

4. Capital cases — record must show inquiry of prisoner if he had any thing to say why sentence should not be pronounced. — In capital cases the record must show that, before passing sentence of death, the court asked the prisoner if he had any thing to say why judgment should not be pronounced against him; failing in which, the judgment in this case was reversed, but the verdict to stand.

Error to circuit court of Warren county.      Brown, J.

The facts are minutely stated in the opinion of the court, rendering any statement here unnecessary.

*T. M. Miller* and *U. M. Young*, for plaintiff in error.

1st. The value of circumstantial evidence, as a theme for refined discussion and subtle reasoning, has long engaged the attention of legal writers. Their labors establish the principle, that circumstantial evidence, so seldom of a conclusive nature, is of secondary value when direct evidence is attainable; by the latter the former is to be tested and measured. It may be assumed, as a correct principle, that, if the force of circumstantial evidence in any given case be inferior to that which springs from the lowest degree of

positive or direct evidence, that is, from the testimony of a single witness, a conviction, certainly in a capital case, will not be sustained. Starkie on Ev. 865. With confessions excluded, the defendant stands convicted of murder on circumstantial evidence alone, the legal effect of which would be far inferior to the testimony of one person present, whom opportunity permitted to witness, directly, the criminal transaction. From the record it could not be affirmed, that the circumstantial evidence there presented warrants a conviction in the mind equal to that which the lowest degree of direct evidence would afford.

The circumstances, in this case, are inconsistent, and do not support the verdict, nor do they exclude every reasonable hypothesis but the one proposed to be established. Nor is this all; the testimony is of a conflicting character. * * * It is evident from both principle and analogy that the law favors the utmost vigilance in the examination of all cases resting purely on circumstantial evidence; nor is the history of criminal jurisprudence, showing so many improper convictions, based on circumstantial evidence alone, wanting in examples tending to support this view. * * * Assuming all to be true which the evidence tends to establish, it is insufficient if some other hypothesis may still be true. Algheri v. State, 25 Miss. 584; 1 Starkie on Ev. 572; Cicely v. State, 13 Smedes & Marsh. 211; McCann v. State, ib. 440. The verdict is not warranted by the evidence. Caleb v. State, 39 Miss. 721; 2 Phil. on Ev. 386. * * * Anxiety for the detection of great crimes leads witnesses to exaggeration, and juries to draw rash inferences. Presumptions often arise from circumstances which would not have been noticed but for the accusation itself. John Pitts v. State, 43 Miss. 472. 2d. The confessions of the prisoner were incompetent, and should have been rejected; they were not voluntary. 3d. In all capital cases, where the jury have returned a verdict of guilty, in the presence of the prisoner, he is, either immediately or at a convenient time soon after, asked by the court if he has any thing to offer why judgment

should not be awarded against him.    4 Black. Com. 375 ; 1 Chitty's Crim. Law, 699, 701, 720 ; 3 Salk. 358 ; Grady v. State, 11 Ga. 253 ; 4 Harr. (Penn.) 129 ; 1 Parker's Crim. Cas. 474, 476 ; 2 Hale's P. C. 217 ; Perry v. State, 43 Ala. 21, 24, and cases cited ; Bishop's Crim. Procedure, § 865.    The reason of the rule seems to be founded in natural justice, and upon the right of the defendant to urge, before sentence is pronounced, grounds in arrest of the judgment, to plead a pardon, or to address the court and ask for leniency.    New trials have been granted upon the statements and explanations of prisoners.    They have an absolute right to be heard before sentence in capital cases, and, as nothing can be presumed for or against a record except what appears upon its face, the right in this case was not accorded.

It has been held in New Jersey that the inquiry mentioned, and the record of it, are necessary to capital cases. West v. State, 2 Zab. 212.    In State v. Ball, 27 Mo. 324, a kindred decision has been made, the court holding that an omission of the inquiry in the record, in a case not capital, is not a fatal error.    The logical and legal inference from this view is, that the converse theory would have been entertained had the case in hand been considered capital. In Pennsylvania the omission was held to be fatal.    4 Harr. 129.    If it be conceded, for the sake of the argument alone, that the defendant had no plea in bar to present, and no ground in arrest of judgment to offer, still his right to address the court, in explanation of his case, remained unimpaired.    The reason and spirit of the law in such cases are apparent.

*J. S. Morris*, Attorney-General.

PEYTON, C. J. :

At the March term of the circuit court of Warren county Nelson James was convicted of the murder of one Jerry Miller, and sentenced by the court to be hung.    From this judgment he brings the case here for the revision of this

court, and assigns for error :  1st. The overruling the defend-
ant's motion for a new trial.   2d.  The admission of the
statement or confession of the defendant as evidence on the
trial.   3d.  Permitting the statement of Ann Miller to go to
the jury.   4th. That the court erred in not asking the pris-
oner if he had any thing to say why sentence of death
should not be pronounced against him.

We shall consider the three first assignments together.

In this case the evidence of guilt, as the record shows,
was entirely circumstantial, and whether that was sufficient
to sustain the conviction is the first question to be settled.
In civil cases it is sufficient if the evidence on the whole
agrees with and supports the hypothesis which it is adduced
to prove, but in criminal cases it must be such as to produce
a moral certainty of guilt, and to exclude any other reason-
able hypothesis.   In both cases, a verdict may be well
founded on circumstances alone, and these often lead to a
conclusion more satisfactory than direct evidence can pro-
duce.   As mathematical certainty is not attainable in such
cases, moral certainty is all that the law requires, and even
direct testimony, it is said, does not afford grounds of belief
of a higher nature.   Evidence which supplies the minds of
the jury to this extent constitutes full proof of the fact in
question before them.   This moral certainty is defined by
Chief Justice Shaw, in his charge to the jury in the
Webster case, to be a certainty that convinces and directs
the understanding, and satisfies the reason and judgments
of those who are bound to act conscientiously upon it.

Upon a careful examination of the evidence in this case,
we think it sufficient to justify the conviction.   And,
although counsel have insisted that the evidence, exclusive
of the confessions of the accused, is not sufficient to sustain
the conviction, we have not been able to find in this record
any confessions of guilt made by the defendant, who, on
the contrary, persistently denied having committed the
offense.

Jacob Black testified, that on Sunday evening after the

killing, in company with Gabriel Bowman, he arrested the defendant and took him to Dart's; that another party of several persons came along to take the defendant from him, to carry him before Esquire Ulm; that he finally gave the defendant up to them; they seemed to be very excited; they said if they took him they would make him tell if he killed Jerry Miller; they said they would kill him if he did not tell; one man who made this threat was a constable; this was about dark on Sunday evening; defendant heard the threat; witness was at the burial, and saw people take the defendant and put his hand on the dead body, saying, "you killed him, Nelson; you know you did;" Nelson denied all the time when thus accused, that he killed Jerry, and said nothing about the shooting; the conduct of these men, though harsh and reprehensible, produced no confession from the defendant of his guilt. The admission of the statement of Ann Miller as evidence to the jury is assigned for error. This statement was drawn out by way of answer to a question put by the defendant who asked her "where were you last night, that you let them get my breeches;" she said she had gone to her sister-in-law's. He said, "that is damnation to me, if it had not been for you I should not have been in this trouble." If there had been any thing in her statement except to give point and meaning to what the defendant said immediately thereafter, it would have been objectionable.

It abundantly appears from the testimony in the case, that an unfriendly feeling existed between the defendant and deceased for some time prior to the killing, growing out of the fact that the wife of the deceased was and had been for some time living with the defendant.

S. F. Ulm, in his testimony, states that he knew the deceased, Jerry Miller, and Ann Miller, his wife, and that a feud existed between the defendant and deceased about Ann; that some time in the spring, before the killing took place, he heard the defendant say, that if the deceased bothered him any more about Ann he would kill him; that

on the preliminary trial before him, an old pair of light gray pantaloons were produced which the defendant said were his; the pants were rolled up, wet and looked as though they had been washed, saw stains on one leg resembling blood.

Alexander Smith, Allen Noble and Harriet Hardiston testified that the defendant had made in their presence threats that he would kill the deceased, similar to that made in the presence of Ulm. Jackson. Marshall says, in his testimony, that, about three or four o'clock, on the evening of the day of the killing, he met the defendant near his house with a gun, who went into witness' house out of a rain, and fearing the powder may have become wet, he stepped out of the house and fired off his gun, and went into the house again, where he reloaded the gun with slugs and shot. The defendant then left his house and went in the direction of the railroad. About an hour after defendant left witness' house he heard a gun fire in the direction of the spot where the body of the deceased was found. The report was like that of the gun fired by defendant outside of his door. Saw the dead body and the slugs and shot after they were taken out of the wound. These seemed to be the same sort with which the defendant loaded his gun at his house. Witness knew defendant's gun, and said the one in court was the same.

Martha Paul testified, that she saw the defendant in the evening of the killing standing under the bridge over the railroad with a gun. She asked him what he was doing there, and he said that he was hunting rabbits. Witness went directly home, and was but a very short time in getting there, and just as she got home she heard a gun fire in the direction she had come. Said that defendant had a little short gun like that exhibited in court.

Jacob Black testified, that he was with the deceased at Newman's store, at nearly dark on the day he was killed; that it was about a half mile from Newman's store to the place of killing; that the direct road crossed the railroad on

a bridge near the spot. On his way home the deceased would have to cross the bridge. It is something less than a half mile from the bridge to the point where the body was found. From the latter place one could see a person crossing the bridge. There is a deep cut in the direction of the bridge. A man pursuing the dirt road would come very suddenly upon one at the place of killing.

John Hardiston testified, that defendant said that he had loaded his gun with slugs and shot, and that he saw Mr. Newman take slugs and shot out of the wound. That the defendant said that he did shoot off his gun, but that he shot at a rabbit, and if he killed Jerry Miller he did not know it.

Moses Kelly testified, that when he got to the grave yard everybody was there but the defendant, and he was going in an opposite direction from the burial ground, but turned and went with the witness and others to the grave yard, and there said that his gun was loaded with slugs and shot, which he shot at a rabbit down on the road, and if he killed Jerry Miller he did not know it. Heard the defendant ask Ann Miller : " Where were you last night that you let them get my breeches ? " She said that she had gone to her sister-in-law's. He then said, " that is damnation to me. If it had not been for you I should not have been in this trouble."

James A. Newman, in his testimony, says, that the gun in court is the same that was got at defendant's, and Mr. Dart testified that defendant lived on his place. That there is a cut at the point where the body was found which would prevent a person on the railroad from seeing one on the dirt road, nor could one on the latter see another upon the former. The locality is favorable for the concealment of one contemplating crime. At the place where the body was found one could easily see another riding across the bridge. At the spot where the body was found the two roads run parallel, the railroad running through a cut ; the bank there is about four feet high.

The previous threats, the antecedent grudge, and lying in wait with a gun loaded with slugs, are evidences of malice and of a deadly purpose, and, together with the other circumstances detailed in the evidence, point to the plaintiff in error as the guilty agent, and establish his guilt beyond a reasonable doubt. For circumstantial evidence, to be sufficient for conviction, should tend to exclude every other supposition inconsistent with the defendant's guilt, but it need not necessarily be such as to show it to be impossible that any other person could have committed the crime. There is nothing in the three first assignments of error to justify this court in reversing the judgment in this case. This brings us to the fourth assignment of error which presents the question, whether it is necessary, in passing the sentence of death, that the court should previously ask the prisoner if he has any thing to say why judgment should not be pronounced against him. This is the first time, so far as we know, that this question has been presented for the adjudication of this court. This seems to be required by the highest authorities, such as Hale, Hawkins, Blackstone, Chitty and Archbold, and the absence of which was ruled in Rex v. Geary, 2 Salk. 630, and Rex v. Speke, 3 ib. 368, to be fatal. And we find it contained in all the books of entries and forms, so far as we have been able to examine them. As these forms of records are deeply seated in the foundations of law, and as they conduce to safety and certainty, they surely ought not to be disregarded when the life of a human being is in question.

In the above cited case of the King v. Geary, in 2 Salk., Geary was attainted of high treason, on an indictment, to which he pleaded not guilty. Upon a writ of error, brought to reverse the attainder, the exception was taken, that it did not appear from the record that he was asked what he had to say why judgment should not be given against him; and the court held the exception good, for he might have a pardon or other matter to move in arrest of judgment. And in New York, in the case of Safford v. The People, 1

Park. Cr. Cas. 476, the court say : " By the record, as cer-tified to us, it does not appear that the court demanded of the defendant what he had to say why judgment should not be pronounced against him. This, undoubtedly, was neces-sary, and it seems it must appear by the record to have been done." And this is recognized by the court, in New Jer-sey, in the case of West v. The State, 2 Zab. 222, as the correct doctrine ; as, also, in the state of Georgia, in the case of Grady v. The State, 11 Ga. 257. And it has been held in Pennsylvania that, upon a conviction for murder in the first degree, it should appear, from the record, that the prisoner was present in court when he was sentenced to be executed, and that he was asked if he had any thing to say why sentence of death should not be pronounced upon him. Hamilton alias Thacker v. The Commonwealth, 4 Harr. 129. And so in Alabama, in the case of Perry v. The State, 43 Ala. 22. This principle of law has its foundation in good sense and common justice, and applies in all capi-tal cases.

Mr. Bishop, in a thorough examination of the English and American doctrines upon this subject, says : " It is now indispensably necessary, even in clergyable felonies, that the defendant should be asked by the court if he has any thing to say why judgment of death should not be pro-nounced on him, and it is material that this appear upon the record to have been done, and its omission will be a suf-ficient ground for reversal of the judgment. On this occa-sion he may allege any ground in arrest of judgment, or plead a pardon, if he has obtained one. If he has nothing to urge in bar, he may address the court in mitigation of his conduct, or cast himself upon their mercy." 1 Bish. Cr. Pr., § 865. Blackstone says : " When, upon a capital charge, the jury have brought in their verdict guilty, in the presence of the prisoner, he is immediately, or at a convenient time soon after, asked by the court if he has any thing to offer why judgment should not be awarded against him." 4 Black. Com. 375. And in the appendix to that volume he

has given a record of an indictment and conviction for murder, which might aid clerks in making up such records, if they were disposed to read it and avail themselves of it.

For the reason that it does not appear that the plaintiff in error was asked by the court if he had any thing to say why judgment of death should not be pronounced on him, the judgment will be reversed and the cause remanded for further action of the court below, in accordance with this opinion. The verdict stands as it is.