## NALLS *v.* STATE.

[90 South. 892. No. 22274.]

1. CRIMINAL LAW. *Circumstantial evidence to warrant conviction must exclude every other reasonable hypothesis than that of guilt.*

A conviction may be had on circumstantial evidence alone when by it guilt is proved beyond a reasonable doubt; but before such evidence can be said to prove guilt beyond a reasonable doubt it must exclude every other reasonable hypothesis than that of guilt.

2. HOMICIDE. *Evidence held not to sustain conviction.*

In this case, where one was convicted of murder upon circumstantial testimony, the facts are *held* insufficient to support such conviction.

APPEAL from circuit court of Holmes county.

HON. S. F. DAVIS, Judge.

Sam Nalls was convicted of murder, and he appeals. Reversed, and defendant discharged.

*Holmes & Williams* and *G. H. McMorrough,* for appellant.

*D. C. Enochs,* assistant attorney-general for the state.

SYKES, P. J., delivered the opinion of the court.

The appellant, Sam Nalls, was convicted of the murder of one John Wesley, and sentenced to the penitentiary for life. From which judgment this appeal is prosecuted.

Both the appellant and deceased are negroes. The testimony relating to the killing is circumstantial. John Wesley, the deceased, was shot with a pistol in the town of Ebenezer about 7:30 o'clock at night, dying from these wounds a few hours afterwards. The deceased was a cook in a road camp whose headquarters were about a quarter of a mile north of the town of Ebenezer. He was last seen by the white man for whom he cooked at about 7 o'clock. At the request of his employer he had prepared some hot coffee for a veterinary surgeon who was to visit the camp to see a sick mule. Immediately after preparing the coffee he left the camp for town. He was shot between fifteen and thirty minutes after leaving the camp.

The appellant, Sam Nalls, was seen in two stores in the town of Ebenezer before these stores closed up, one about 6:30 and one about 7 o'clock that night. He was wearing a blue serge suit of clothes and a large black slouch hat. Several people who were in the last store to close heard the shooting variously estimated at between ten and thirty minutes after the closing of the store.

A negro woman testified that she met the deceased, John Wesley, a short distance north of one of these stores; she was going north, and Wesley was going south; that a short time after passing deceased she met a man going in the same direction as deceased, and a short distance behind him; that this man crouched up against the fence. She testified that she recognized this man, and that it was the appellant; that a few moments after passing the appellant she heard the shots fired. She testified first on the trial that she passed a man a short distance after passing the deceased, but on further examination she testified that this man was the appellant. She was impeached by three negro witnesses, who testified that she had told them that she was unable to identify this second man.

The deceased after being shot went to the house of a negro woman, and stated to her that he was dying; that he had been shot to death. To this woman, a physician, and another white man he made a dying declaration. The

declarations made to each of these witnesses were practically the same, but that to Dr. Lucas was more complete, and we take the substance of this declaration from that testimony. He was absolutely rational when this statement was made. He told the doctor that he was shot in two places in his stomach. The doctor asked him if he knew who shot him, and he said, "Yes, sir, it was nobody but ——" naming a white man for whom this negro had been working for several months. He then told him in detail about having prepared coffee for the veterinary surgeon, and that he then got his supper and put it in a bucket and walked down toward Edna Mayberry's; that in a few minutes he heard somebody walking rapidly behind him; that when he caught up with deceased, deceased turned and faced him, and as he did this the man began to shoot; that he then stated, calling the man Mr. —— (his first name) "don't shoot me!" and then he ran. The doctor asked him what this man had against him, and he said, "Nothing in the world, unless he thought he had been stealing something from his premises;" that they had never had a cross word; that he did not know why he wanted to shoot him. The doctor says that the deceased's whole mind seemed to have been upon the subject of why this man wanted to shoot him; that when he was filling up with blood and was suffering terribly he said, "I don't see what Mr. —— wanted to shoot me for."

The testimony shows that the deceased knew the man he thought shot him very well. And the testimony further shows that they were very close together when he was shot. The next morning after the shooting one of the white witnesses in the case went out to the house of a negro woman for the purpose of arresting the appellant. As he approached the house he saw the appellant's mother and half-brother come out of the house with a suit case, and he asked them where Sam Nalls was, and they replied that he was at Rich Roaches'. This witness, however, went on in the house, and went in a room where the appellant was. He states that the appellant attempted to run, but

he pointed his pistol at him, and told him to throw up his hands. The appellant threw up his hands, and at once exclaimed that he did not have the two dollars and fifty cents that he owed this witness. The testimony further shows that he owed this witness two dollars and fifty cents, and the witness had been very diligent in trying to collect it.

There is also some testimony in the record that at various times the appellant and the deceased called upon the same woman. There is no testimony, however, to show that they ever had any difficulty, nor that any ill feeling existed between them, nor of any motive whatever for the killing of the deceased by the appellant.

The same white witness who arrested the appellant was one of the witnesses to whom a dying declaration was made. The negro in this dying declaration, which was substantially the same as that made to the doctor, further testified that this witness' cook also knew who shot him, as she had passed them both the night before. The cook was the witness who identified the appellant.

It is also necessary to a full understanding of the case to say that the appellant, if he be the guilty party, would have had to walk north after leaving the store, away from the business portion of the town, then wait for the approach of the deceased and get behind him, and then travel south toward the heart of town and do the shooting.

The attempted flight of the appellant from this witness is explained by his exclamation that he did not have the two dollars and fifty cents. The only evidence tending to connect the appellant in any way with the crime was the fact that the negro woman says she identified him as being crouched against the fence a short distance behind the deceased. This part of her testimony is impeached by three disinterested negro witnesses, who testified that she said she was unable to tell who this man was. The fact that she went into detail about his having on a blue serge suit and a black slouch hat and being so positive in her identification in this trial, whereas she had made this former

statement, discredits her testimony. It would be very hard at night to tell whether a suit were dark blue or black especially in the dark. But even if her testimony be true as to having met the appellant, still he may not have been the guilty party. On the other hand, the deceased was very positive that he was shot by a white man, and not by a negro. The man who shot him was very close to him, and when he first heard his footsteps behind deceased turned, and certainly was better able to identify his assailant than was the witness. The white man, who the deceased claimed to have shot him, testified that he did not do it; that he was not within one-quarter of a mile of the place when the shooting occurred. The appellant did not testify.

The rule relating to the conviction of a party for crime upon circumstantial testimony has been time and again stated by this court. In the case of *Williams* v. *State,* 95 Miss. 671, 49 So. 513, it is there laid down as follows:

"It is elementary law that a conviction may be had on circumstantial evidence alone when by it guilt is proven beyond a reasonable doubt; but it is also elementary that, before such evidence can be said to prove guilt beyond a reasonable doubt, it must exclude every other reasonable hypothesis than that of guilt."

This statement of the law is quoted in the case of *Simmons* v. *State,* 106 Miss. 732, 64 So. 721, wherein all of the other authorities bearing upon this question are referred to.

A reading of the statement of facts above set out we think is all that is necessary to demonstrate the fact that the evidence in this case cannot be said to exclude every other reasonable hypothesis than that of guilt.

The judgment of the lower court is reversed, and the appellant is discharged.

*Reversed, and appellant discharged.*