SMITH, Justice.
Herman Harris was tried in the Circuit Court of the Second Judicial District of Hinds County upon an indictment charging him with the murder of Johnny Hollings. A verdict of guilty of murder was returned, but the jurors were unable to agree upon his punishment. Accordingly, Harris was sentenced by the court to serve a life term in the penitentiary. He appeals from that conviction and sentence.
The homicide, out of which the prosecution arose, occurred on a Saturday night at a place known as Thelma Evans Bee Bop Cafe. Hollings, also known as Sonny Boy, and his party had arrived first at the cafe. Hollings was operating the music machine when Harris came in. Harris and Hol-lings had never met or seen each other previously, but Harris mistook Hollings for a man he knew whose name was Estelle.
Harris accosted Hollings as Estelle and Hollings replied that he was not Estelle. Harris insisted that he was and pushed him. There ensued some further argument about whether Hollings was Estelle or not. A witness testified that Harris then said to Hollings that he, Hollings, didn’t know who he was “messing with,” and that he would kill him. Harris also told Hollings that he had a “whole lot of dynamite” for him, and continued to insist that Hollings was Estelle. Shortly afterward Harris left the cafe. The time intervals are not clear from the record, but sometime later, apparently about midnight, Hollings went out the front door with a woman named Daisy Evans who wanted him to meet some people who were parked in an automobile outside.
Some five minutes after Hollings went out there was the sound of a shot and Daisy Evans was heard to scream “somebody shot Sonny Boy.” Hollings, or Sonny Boy, was found to have been shot and was lying on his back in front of the cafe. He died without speaking. Directly after the shot was fired, Harris was observed to drive off rapidly in his automobile.
*762 Officers who were called to the scene, after interrogating those present, obtained a bench warrant for the arrest of Harris. By the time this had been done, it was nearly three o’clock Sunday morning. Harris was living with his father at his father’s home and was in bed when the officers arrived and took him into custody.
The investigation continued on the day following the shooting. It was learned that Hollings’ death had been caused by buckshot which had penetrated his head and upper body, eleven having taken effect. This indicated that the weapon used had been a shotgun. Upon further examination of the scene in daylight, the wadding from a twelve gauge shotgun was discovered between the place where Harris’ automobile had been parked and where Hollings had fallen.
In an effort to discover the weapon used, the officers revisited the home of Harris’ father, who had some reputation as a deer hunter. When they arrived there, they did not enter the house but talked to the father out in front. According to the testimony of the officers, they asked him if he had a shotgun, and having been told that he did, asked if they might see it. The father went into the house and returned with a twelve gauge pump gun, which he handed to the officers. The officers testified, without objection, that the father also told them that his son, appellant Herman Harris, had taken the gun out the night before and sometime later had returned and placed it under a table. This was denied by the father when he testified as a defense witness at the trial. The gun was introduced in evidence without objection.
Certain statements were made by Harris to the officers after his arrest. Before any testimony was given as to this, however, counsel for appellant moved the court to make a preliminary determination, in the absence of the jury, as to “whether or not Herman Harris waived his right or if he intelligently waived his right” before permitting these statements to be placed in evidence. The court granted the motion, excluded the jury, and heard witnesses upon that question, both for the prosecution and for the defense, granting each side the right of cross examination upon the issue.
The substance of the testimony for the prosecution was to the effect that Harris had been told that he did not have to make a statement or tell the officers anything. He was told, moreover, that whatever he said might be used against him in court. Harris told the officers, they testified, that he did not need a lawyer “because he was not guilty” and consented to talk and did talk freely. No threats or promises of any kind were made or given and Harris told the officers that he would talk “as he had nothing to hide.” Harris seemed intelligent and talked intelligently and as if he understood what had been said to him. He was told that he had a right to have a lawyer before he said anything. Harris was also told that the lawyer might be a lawyer of his own choice, or, if he could not afford a lawyer, that one would be appointed for him. One of the officers said that, in addition, he had read the warnings to Harris from what is sometimes called a “Miranda” card. He produced the card and read from it into the record the warnings which he had given Harris. These were, he had a right to remain silent; anything he said could be used against him in a court of law; he had a right to talk to a lawyer and to have him present with him while he was being questioned; and, if he could not afford to hire a lawyer, one would be appointed to represent him. The giving of these warnings was followed by the question: “Do you understand each of these rights I have explained to you?” To this, Harris had replied “Yes, sir.”
Harris testified in his own behalf at this preliminary hearing. He contradicted the officer’s testimony as to the date and as to those who were present. However, he admitted that he was told by Adams, a deputy sheriff, that he did not have to tell him anything and that he had a right to a law *763 yer. He admitted also that he knew that he had these rights and said that the deputy repeated to him the statement that Harris did not have to tell him anything. He said that he had gone through the fourth grade in school and had finished the tenth grade in “GI school.” In other respects he denied the testimony of the officers as to what had occurred.
The evidence was sufficient to support the conclusion that Harris’ rights had been explained to him in detail, and had been understood by him prior to interrogation and before he made any statement. Also, that his subsequent statements to officers were voluntarily made with an understanding of his rights and that his statements under these circumstances, constituted an intelligent waiver on his part. Upon the basis of this evidence, the court was justified in ruling that the statements made to the officers were admissible in evidence against Harris.
Following the court’s ruling, the jury was returned to the courtroom and the trial proceeded. A deputy sheriff then testified as to statements made by Harris. He said that Harris had denied having killed anyone. Harris told the officers that on the occasion in question he had been drunk and could not remember anything about it. But, he had told them, he did remember that he had driven around the circular driveway of the Bee Bop Cafe and had parked at some pecan trees. He also remembered getting out of his car and taking out his gun, which had been lying on the floor boards, and “standing there.” He remembered putting his gun back into the car and driving off, but he did not remember having pulled the trigger.
Harris testified as a witness in his own behalf. He admitted accosting Hollings as Estelle in the Bee Bop Cafe. He also admitted that he had said something to Hol-lings about dynamite. But, he said, he had realized almost at once that Hollings was not Estelle, and the remark about dynamite had been a joke and he had not made any threat to kill. He said also that, when he became aware of his mistake in addressing Hollings as Estelle, he apologized to him and left.
He testified further that he had gone from the Bee Bop to Huggins Store. Aft-erwards, he returned to the Bee Bop looking for a girl of his acquaintance and was told by her sister that she was at home. Harris left, he said, and went to the girl’s home but no one was there. He returned to the Bee Bop and told the sister she had sent him on a “false trip.” He then went to his father’s home but didn’t go in. He decided to go to a place called Horton’s, for a beer. He drove there but it was closed. He drove over to Bolton, cut across and hit Jones Road which he followed to Highway 22 near Sandy Hill. He then went to a place on Highway 22 called Dusty’s, still looking for a can of beer. He said, however, that there were so many cars parked at- Dusty’s that he decided not to go in. He took Highway 22 to Brownsville and followed that road home. He didn’t know what time this was. He was not, he said, at the Bee Bop when the shot had been fired and knew nothing of any shooting there. He denied having been drunk that night and said that he only had three or four beers. Also, he denied having had a gun.
The only witness for the defense other than Harris himself, was his father. The father testified, that on the night in question, his son had come home sometime after midnight and had gone to bed. This witness said that his son had not taken a gun with him when he had gone out that Saturday night and did not have a gun when he came in. He said the pump gun, which he had given the officers, belonged to him and that he had placed it under a studio couch when his son and wife had separated.
Several grounds are assigned and argued for reversal.
It is argued on behalf of Harris that the shotgun, which was introduced in evi *764 dence, was the product of an illegal search and seizure. The evidence, however, shows that the gun belonged to appellant’s father and was voluntarily produced by him and handed to the officers. Moreover, the gun was offered and received in evidence without any objection on the part of the appellant.
In Head v. State, 246 Miss. 203, 206, 136 So.2d 619, 621 (1962), cert. denied, 371 U.S. 910, 83 S.Ct. 251, 9 L.Ed.2d 170 (1962), this Court held:
In order to avail of the constitutional provision of unlawful search and seizure, the sheriff must invade the premises or property of defendant, and such defendant must at least have a right of possession that would make him owner for the time being.
In any event, there was no objection and an objection was essential in order to preserve the point on appeal. Poole v. State, 231 Miss. 1, 94 So.2d 239 (1957); Leverett v. State, 197 So.2d 889 (Miss.1967); Gordon v. State, 160 So.2d 73 (Miss.1964); and, Henry v. State, 253 Miss. 263, 154 So.2d 289 (1963), vacated 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), rehearing denied, 380 U.S. 926, 85 S.Ct. 878, 13 L. Ed.2d 813 (1965) on remand, 253 Miss. 263, 174 So.2d 348 (1965), motion denied, 381 U.S. 908, 85 S.Ct. 1528, 14 L.Ed.2d 431 (1965), on remand, 198 So.2d 213 (Miss.1967), reinstated, 202 So.2d 40 (Miss.1967).
It is next argued that it was reversible error for the trial court to admit testimony as to the statements made by Harris to the officers, citing Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.2d 974 (1966). It appears in the record that the trial court, at the request of appellant, and before ruling upon the admissibility of the statements, granted a full evidentiary hearing upon that question. While the evidence adduced in some respects was conflicting, the court resolved these conflicts against the appellant. The evidence was ample to support the court’s conclusion that the appellant was fully informed as to his rights, that he understood what was said to him, and that in making the statements, there was a voluntary and intelligent waiver on his part.
In Jenkins v. State, 214 So.2d 470, 472 (Miss.1968) it was stated:
Miranda requires meaningful advice to an unlettered and unlearned person, in language which he can comprehend and on which he can knowingly act. The crucial test is whether the words used by the officers, in view of the age, intelligence and demeanor of the individual being interrogated, implied a clear understanding of all of his rights. The court 'must then determine objectively whether the words used by the interrogating officers were sufficient to convey the implied warning. Fritts v. United States, 395 F.2d 219 (5th Cir.1968); Coyote v. United States, 380 F.2d 305 (10th Cir.1967).
Harris had finished ten grades in school and, as his own testimony shows, was neither unlettered or unintelligent. The court was justified by the evidence in admitting these statements.
At the conclusion of the case for the prosecution, appellant moved for a directed verdict. It was alleged in the motion that the evidence against appellant was “entirely circumstantial and had not risen to above the probability of innocence on the part of the defendant,” and, the evidence having been circumstantial, “the defendant is under no obligation to prove his innocence.”
There was no motion for a directed verdict at the conclusion of the trial.
Obviously, the evidence supporting the charge against appellant was, in part, circumstantial. But, when coupled with the facts proven by direct evidence, including the appellant’s threat to kill the deceased, and his statements made to the officers, it was sufficient to make the guilt *765 or innocence of Harris a question for the jury.
In James v. State, 45 Miss. 572, 2 Mor. St.Cas. 1741 (1871) this Court held that a verdict of guilty in a criminal case may be founded on circumstantial evidence alone. In Browning v. State, 33 Miss. 47, 77, 1 Mor.St.Cas. 991, 1019 (1857) it was held:
‘What circumstances will amount to proof, can never be a matter of general definition; the legal test is the sufficiency of the evidence to satisfy the understanding and conscience of the jury.’ On the other hand, absolute ‘metaphysical and demonstrative certainty is not essential to proof by circumstances. It is sufficient if they produce moral certainty, to the exclusion of every reasonable doubt.’
See also Nalls v. State, 128 Miss. 277, 90 So. 892 (1922) and Poore v. State, 205 Miss. 528, 37 So.2d 3 (1948), suggestion of error overruled, 205 Miss. 528, 37 So.2d 357, cert. denied, and appeal dismissed, 336 U.S. 922, 69 S.Ct. 656, 93 L.Ed. 1084 (1949), rehearing denied, 336 U.S. 947, 69 S.Ct. 810, 93 L.Ed. 1104 (1949).
The appellant next seeks to invoke what is sometimes referred to as the Weathersby rule. Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933).
In Weathersby the Court said that it was an established rule in this state that where the defendant or defendant’s witnesses are the only eye witnesses to a homicide, their version must be accepted, unless substantially contradicted in material particulars by credible witnesses, physical facts, or facts commonly known.
In the present case, there was no question of self-defense and the homicide unquestionably was in the nature of an assassination. Moreover, appellant was contradicted substantially in several material particulars, notably by the officers as to the incriminating statements made to them and by witnesses who testified to the threats against the deceased. Also, he was contradicted by eye witnesses’ testimony that he was there present and was seen to leave hurriedly immediately after the shot was fired. The Weathersby rule has no application to the facts in this case.
We have carefully read and considered the entire record and the several grounds assigned by appellant for reversal and have concluded that the appellant received a fair trial, that evidence was ample to support his conviction of the crime charged and that the case should be affirmed. No question is raised as to the propriety of the instructions granted by the court at the request of the prosecution and it appears that all of the instructions requested by appellant were granted by the trial court.
Affirmed.
GILLESPIE, P. J., and RODGERS, PATTERSON and ROBERTSON, JJ., concur.